**UNITED STATES of America**

v.

**Stephen GIANAKAKIS, Defendant.**

**Crim. No. 86–00064–B.**

United States District Court,
D. Maine.

July 15, 1987.

Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., for U.S.

Marshall Stern, Stern & Goldsmith, Bangor, Me., for defendant.

MEMORANDUM AND ORDER

CYR, Chief Judge.

Defendant is charged with conspiracy to possess, with intent to distribute, in excess of 1,000 pounds of marijuana, and with conspiring to import marijuana, in violation of 21 U.S.C. §§ 841(a), 846, 952(a), & 963. Both charges stem from an alleged conspiracy to use a fishing boat, the Gulf King IV, to off-load marijuana from a large Colombian vessel, and to bring the marijuana into the United States. Defendant moves to dismiss the charges, on the ground that the indictment was obtained in violation of a cooperation agreement with the Government. After three hearings and review of all transcripts and exhibits, as well as the post-hearing briefs filed by the parties, the court makes the following findings of fact and conclusions of law.

FACTS

The indictment alleges that the Gulf King IV conspiracy began in September, 1982, and continued through October of 1982. Late in 1983 or early in 1984, defendant became aware that his name had been mentioned in the course of grand jury proceedings investigating the Gulf King IV conspiracy. Defendant contacted Marshall Stern, Esquire, a Bangor attorney with extensive experience as defense counsel in federal criminal cases, particularly drug cases. Stern arranged for a meeting with then-Sergeant Harry Bailey[1] of the Maine State Police (MSP) who was involved with the Gulf King IV investigation. Stern's purpose in arranging the meeting was to explore whether the Government was interested in obtaining defendant's cooperation in the investigation.[2]

---

1. Sergeant Bailey retired from the Maine State Police on February 27, 1986.

2. The Gulf King IV conspiracy involved an abortive plan to off-load marijuana from a Colombian vessel along the coast of Maine on or about October 7, 1982. By March, 1984, the captain,

owner and members of the crew of the Gulf King IV had been convicted for their roles in the attempted smuggle, and the Government was continuing its investigation in an attempt to identify the organizers and other conspirators. *See generally* Government Exhibits 2–5, 7.

Bailey, Stern and the defendant met at Stern's office in Bangor early in 1984. Bailey testified that he had expected to meet a fourth individual, Peter Sears, at this meeting, but that Sears was not there. There were no promises of immunity of any kind made at this meeting. Although Bailey directly asked defendant some questions, Stern did most of the talking and advised Bailey of the events about which defendant had information.

Based on the information he received at this meeting, Bailey believed that defendant's cooperation might be valuable to the Government. Bailey contacted MSP Trooper Steven Spaulding, who was the case agent for the investigation of the Gulf King IV conspiracy, and set up a meeting among defendant, Stern, Spaulding and then-Assistant United States Attorney Pasquale J. Perrino, Jr.[3] Although Perrino had considerable experience in the prosecution of criminal cases in state court, the Gulf King IV case was one of the first federal drug cases assigned to him. The purpose of this meeting was to permit Spaulding, who was the officer most familiar with the Gulf King IV conspiracy investigation, and Assistant United States Attorney Perrino, to continue to explore the possibility of arranging defendant's cooperation with the Government. This second meeting [hereinafter referred to as the Portland meeting] took place in Perrino's office in the basement of the U.S. Courthouse in Portland, Maine, sometime in the late winter or early spring of 1984. The defendant, Stern, Spaulding, Perrino, and Peter Sears attended the meeting. Sears' attendance was arranged by defendant, at the request of Stern, as suggested either by Stern or by the Government. Stern represented defendant at this meeting. Sears was not represented by counsel.

The meeting began with a general proffer by Stern as to the information possessed by defendant and Sears. Perrino informed defendant and Sears that they would receive "use immunity" for statements made in the course of the meeting. Both defendant and Sears understood "use immunity" to mean that the statements they made during the meeting could not be used against them in any prosecution for the events discussed at the meeting. After defendant and Sears were informed of the conditions under which their statements were to be given, defendant and Sears divulged their knowledge of facts relevant to the Gulf King IV conspiracy, including names, dates, places, and actions of other alleged co-conspirators, some of which inculpated defendant.[4]

Perrino then asked that the defendant, Sears and Stern step outside Perrino's office, while he conferred with Spaulding. Spaulding told Perrino that he had some doubts about whether defendant had related all he knew about the conspiracy. Nevertheless, Spaulding and Perrino agreed that the defendant could provide valuable assistance in building a case against two individuals, John Morrell and Robert Southerland, whom the Government believed to be the organizers and financiers of the Gulf King IV marijuana smuggle.

When asked what next happened after the meeting between Perrino and Spaulding, defendant testified:

> I remember myself and Mr. Sears being out in the hall, and Mr. Perrino came out and said he wanted us to testify in this case; that he wanted to use our testimony in this case; and, that we wouldn't be prosecuted or indicted if we would coop-

---

**3.** Perrino was appointed an Assistant United States Attorney in September, 1983. He returned to private practice in October of 1986. *See* Transcript of February 19, 1987 Hearing, at 23.

**4.** The court assumes, for the purpose of this motion, that defendant inculpated himself by his statements at the Portland meeting. In response to the court's question as to whether, without giving any detail, the defendant admit-

ted criminal involvement during the Portland meeting, Perrino replied "yes." Transcript of February 19, 1987 Hearing, at 62. Of course, irrespective of whether any cooperation agreement had been reached, defendant's own inculpative statements in the presence of Perrino would have been inadmissible against defendant in any criminal prosecution on the substantive charge. *See* Fed.R.Crim.P. 11(e)(6)(D); Fed.R. Evid. 410(4).

erate. And I agreed to cooperate, and Mr. Sears did.

Transcript of February 19, 1987 Hearing, at 97. On cross-examination, defendant testified that it was his understanding that Perrino had offered him a different type of immunity at the end of the meeting than the use immunity offered at the beginning. When asked who was present during this conversation, defendant stated:

> I believe [Perrino] walked out of the door, and me and Mr. Sears were outside in the corridor, and Mr. Stern was in the corridor just above us, I believe. And I believe that he put his arm on my shoulder and said that he wasn't going to indict me as long as we were going to continue to *cooperate* in this matter. That I wouldn't be indicted in this case.

*Id.* at 110 (*emphasis added*). In response to questioning by the court, defendant gave essentially the same testimony. *See id.* at 117.

Stern's testimony on this point was similar to defendant's. When asked whether he was present during all conversations between Perrino and defendant, Stern replied:

> I was present at all conversations, with the exception of when Mr. Perrino asked us to step outside into the hall while he continued to speak to Mr. Spaulding inside. When he came out of the room—he exited the room. I was sort of pacing up and down the corridor. He came out, put his arm on [defendant], and he says, "Stevie," he said, "there's some questions that we have to go over, but we generally believe you. We want your cooperation. We want you to testify. And *if you testify*, we would not indict you, we will not prosecute you. But you've got to agree to *continue to do what you're doing.*"
>
> And that's—and I turned. Just as I was approaching him, as he continued to talk, and I came closer, and then I reiterated that statement to Mr. Perrino. He repeated it to me.

*Id.* at 127 (*emphasis added*).

Under examination by defendant's counsel, Stern reiterated the substance of his direct testimony, but with a somewhat stronger suggestion that it was defendant's *availability* and *willingness* to testify which were expected:

> I was pacing up and down the hall when Mr. Perrino exited and made the statement that I had previously testified to, that he was interested in securing their *testimony* against these individuals, *wanted them available.* He was not going to prosecute them on the matter if they—or indict them if they would *continue to be available and were willing to testify.*

*Id.* at 144 (*emphasis added*).

At the second hearing held in this matter, Peter Sears gave testimony similar to that given by Stern and defendant. When asked if he had any further conversation with Perrino regarding immunity, after he had disclosed the details of his involvement in the conspiracy, Sears replied:

> Well, they told us in no uncertain terms they told us that, if we *agreed to testify* for them, that we would not be prosecuted. And *we agreed to testify.* That's what I was there to do. Whatever I could do to fix the situation. And they absolutely told me—that's why I never hired an attorney. That was the whole purpose of that.

Transcript of March 26, 1987 Hearing, at 10 (*emphasis added*).

On cross-examination, Sears reiterated that "if we agreed to testify, if we were willing to go into court with this, that they [A.U.S.A. Perrino] would not prosecute us." *Id.* at 28; *see also id.* at 29. The court questioned Sears about the basis for his assumption that, if he were willing to testify, he would not be indicted:

> [Sears:] The basis for that, I guess it's not really an assumption. It's what I was told.
>
> The court: You were told it in what words?
>
> The witness: If you are willing to testify against these two men, then we will not prosecute you.
>
> The court: All you had to do was say you were willing, is that correct? You didn't have to testify?

The witness: No. We had to testify, it was my understanding.

The court: Have you testified?

The witness: Are you willing to testify? Yes, I'm willing. Will you testify? Yes, I will. Let me know when.

The court: You haven't been called to testify, have you?

The witness: No, I have not.

The court: So what I am asking is how clearly you can recall the words in which this promise was made to you. And if you can't, just say you can't.

The witness: *Willing to testify* is what I'm saying. *But I guess I really don't remember.* What I *understand* is, *if we were willing to testify*, then they wouldn't prosecute us. That was a big step to get over. Are you willing to testify, put your life on the line.

*Id.* at 31–32 (*emphasis added*). In response to the question: "Would it be fair to say that you cannot remember the exact words in which any such promise about testifying was made to you," Sears replied: "Yes, yes Sir." *Id.* at 34.

Perrino's testimony as to what was said to defendant in the hallway following the Portland meeting differs slightly, but importantly, from the testimony of the defense witnesses. Perrino consistently testified that immunity from prosecution was conditioned upon defendant actually testifying against two "superior targets." *See* Transcript of February 19, 1987 Hearing, at 29; *id.* at 35–36; *id.* at 50–51. Although Perrino's testimony as to the difference between use immunity and transactional immunity demonstrates confusion in his own understanding, *see id.* at 31–33, he consistently testified that the only immunity actually extended to the defendant was immunity from the use of defendant's statements. Thus, notwithstanding that Perrino viewed defendant as a "cooperating witness" following the Portland meeting, *see* Transcript of April 23, 1987 Hearing at 23, Perrino testified that he was of the understanding that the only benefit defendant would receive for providing information was immunity from the use of that information; and that unless and until defendant did testify, the Government was free to seek his indictment using evidence obtained independently of the statements given under the grant of limited use immunity. *See id.* at 29.

No record of the Portland meeting was kept, nor was any discussion or agreement between the parties concerning cooperation or immunity ever memorialized in any way.

Following the Portland meeting there was no further contact between defendant and Sears and any state or federal agent. Perrino did not ask the defendant or Sears to testify for the Government. According to Perrino, he had intended to use defendant and Sears, together with a third person, LeMoine, to build a case against John Morrell and Robert Southerland, the suspected organizers of the Gulf King IV smuggle. LeMoine had pleaded guilty to charges arising out of his role in the conspiracy, but refused to cooperate with the Government after he was sentenced. Without LeMoine, Perrino did not believe that he had a case against Morrell and Southerland, and hence he believed that he had no need for the testimony of the defendant and Sears.

Notwithstanding that he has never been asked to testify, defendant contends that he has fulfilled his part of the cooperation agreement by remaining *available* to testify and by cooperating with the Government in other ways. Defendant contends that he continued to cooperate with the Government by passing along information through Stern to the United States Attorney's office in Bangor. From the testimony of both Stern and Perrino, it appears that Stern frequently did business with the United States Attorney's office involving other defendants. During these visits Stern would either advise Perrino that defendant was available and willing to testify, or he would ask if Perrino needed any information from the defendant. *See* Transcript of February 19, 1987 Hearing, at 37–39, 59–60; 66–67 [Perrino's testimony]; 133–137, 139–141 [Stern's testimony].

The testimony established several other points with regard to defendant's "cooperation" following the Portland meeting. Defendant testified that he travelled to Ban-

gor with Sears sometime in 1985 for the purpose of meeting with state or federal officials concerning the Gulf King IV conspiracy. The defendant and Sears testified that they drove to Bangor together, arriving at Stern's office before noon, and that they stayed at Stern's office until 5:00 or 5:30 that evening. Although defendant testified that he was "pretty sure" that Sergeant Bailey was present and that defendant was questioned, *see id.* at 99–100, Sears testified that no meeting took place with any government official. *See* Transcript of March 26, 1987 Hearing, at 15. Bailey confirmed Sears' testimony, stating that he did not meet with defendant and Sears in Stern's office or in any other place. *See* Transcript of February 19, 1987 Hearing, at 162, 164–65. It appears that this "meeting" was arranged by Stern alone; Bailey was not actively involved in the smuggling investigation in 1985, *see id.* at 164, and Perrino testified that the case was "on the back burner," *id.* at 37, and that he did not have any occasion to ask Stern to get information from defendant. *See* Transcript of April 23, 1987 Hearing, at 2, 25.

A letter was sent by Perrino to Stern on February 20, 1986, which states in full as follows:

Re: Gulf King Four

Dear Marshall:

In reviewing the above captioned case, I find there are a few more questions we have that we would like to ask your client Steve Gianakakis. Could you please make him available for further questioning in this office as soon as your calendar will permit.

/s/P.J. Perrino, Jr.
Assistant U.S. Attorney

Government Exhibit 1. When Perrino first testified about this letter, he stated that there was no follow-up to the letter because LeMoine, whom Perrino considered an essential witness, continued to refuse to cooperate. *See* Transcript of February 19, 1987 Hearing, at 39. In response to the Court's questions, however, Perrino indicated that the letter may have been written in response to Stern's request:

[by the court]: Do you recall what prompted that letter [Government Exhibit 1]?

[Perrino]: Mr. Stern had asked me on several occasions if we still wanted him, and I said, at various times, we would still like him, not specifically saying anything. And *Mr. Stern asked if I would write a letter concerning that,* and I did in February, *that I would like to see him.* I did not see him.

The court: So your testimony is that Government's Exhibit 1 was written in response to Mr. Stern's urgings?

The witness: He asked me—my recollection is, do we still want him. I said yes, I'd still like him. And my recollection is that *he wanted me to write a letter to that effect.* And I subsequently wrote him a letter to that effect, that we would want him.

I have to assume from the date of the letter, your Honor, that something must have been communicated to me by Mr. Spaulding or Mr. Bailey at the time, that something may have happened with Mr. LeMoine. However, nothing did happen. I'm just guessing, though, your honor.

The court: Well, you're not just guessing, I take it, about whether or not something further did happen?

The witness: No, there's no question. Nothing happened.

Transcript of February 19, 1987 Hearing, at 59–60 (*emphasis added*).

Stern suggested that information provided by the defendant was continually being passed along to Perrino. *See id.* at 134–35. When asked to be more specific, the only such information Stern could recall concerned the whereabouts of John Morrell, a fugitive from justice. *See id.* 135–40. But Perrino testified that he did not initiate a request that Stern obtain any such information from defendant, but that Stern had *offered* to try to obtain information on fugitives, and Perrino accepted the offer. *See* Transcript of April 23, 1987 Hearing, at 16–18, 25–26. Moreover, Perrino clearly recalled that he never did *receive* any such information. *See id.* at 18, 26.

The secret indictment against defendant was unsealed on August 6, 1986. For purposes of the present motion, the Government has conceded that the information related by defendant at the Portland meeting was truthful, and that any doubts that the Government had as to the veracity of that information played no role in the Government's decisions to not use defendant as a witness, and to seek defendant's indictment. Defendant does not contend that the indictment was obtained in violation of the limited use immunity which he was granted at the Portland meeting. The court has reviewed the relevant grand jury transcripts, *see* Government Exhibits 2, 3, 4 & 5, and is satisfied that the indictment is based on evidence independently obtained.[5]

## DISCUSSION

Defendant contends that, "in instances where a defendant has performed his role in an agreement while the Government has not, dismissal of the indictment is a proper and appropriate remedy." Defendant's Memorandum in Support of Motion to Dismiss, at 5. Most of the cases cited by defendant involve *plea* agreements, rather than *cooperation* agreements. In *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1951), the Court stated:

> This phase of the process of criminal justice [plea bargaining] and the adjudicative element inherent in accepting a plea of guilty, must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

> On this record, petitioner "bargained" and negotiated for a particular plea in order to secure dismissal of more serious charges, but also on condition that no sentence recommendation would be made

by the prosecutor. It is now conceded that the promise to abstain from a recommendation was made, and at this stage the prosecution is not in a good position to argue that its inadvertent breach of agreement is immaterial. The staff lawyers in a prosecutor's office have the burden of "letting the left hand know what the right hand is doing" or has done. That the breach of agreement was inadvertent does not lessen its impact.

*Id.* at 262, 92 S.Ct. at 499.

Several cases analyze alleged breaches of cooperation agreements in the same manner as alleged breaches of plea agreements. *See United States v. Carrillo,* 709 F.2d 35, 36 (9th Cir.1983); *Rowe v. Griffin,* 676 F.2d 524, 526 (11th Cir.1982); *United States v. Garcia,* 519 F.2d 1343, 1345 n. 2 (9th Cir.1975).

The parties are not in disagreement as to the appropriate framework for analysis. The federal courts analogize to contract law in assessing claimed breaches of cooperation (plea) agreements. *See, e.g., Carillo,* 709 F.2d at 36–37. In *Rowe v. Griffin,* the Eleventh Circuit stated:

> We believe that, as a matter of fair conduct, the government ought to be required to honor such an agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

676 F.2d at 527–28. After discussing *Santobello,* and noting that cooperation agreements are analogous to plea agreements, the court held:

> This contractual analysis applies equally well to promises of immunity from prosecution. When such a promise induces a defendant to waive his fifth amendment rights by testifying at the trial of his

---

5. This finding does not preclude defendant from challenging the admission of evidence at trial, or moving *in limine* to preclude certain evidence, on the ground that the use of such evidence would violate the use immunity granted defendant at the Portland meeting.

confederates or to otherwise cooperate with the government to his detriment, due process requires that the prosecutor's promise be fulfilled. We hold that once the defendant's good faith compliance with the terms of the agreement is established, the state must perform on its side and any attempt by the state to breach the agreement is per se a bad faith prosecution. Cf. *Acosta v. Turner*, 666 F.2d 949, 953 (5th Cir.1982) (where the defendant stipulated to competency in reliance on a promise of the state trial court, the court must keep its promise). 676 F.2d at 528 (footnote omitted).

The disagreement centers around the *terms* of the cooperation agreement. Defendant claims that the Government promised not to prosecute him so long as he "continued" to cooperate and remained *available* to testify. The Government says: "[i]n the words of contract law, the agreement remained executory." Government's Supplemental Memorandum, at 5. Thus, "[i]f the Government had used defendant as a witness at trial, it would have been bound by Mr. Perrino's earlier promise of complete immunity, but that never occurred. The defendant merely standing ready to provide testimony is insufficient to forever bind the Government to a promise of complete immunity." *Id.*

Defendant testified that Perrino *said* that defendant would not be prosecuted if he *cooperated, see* Transcript of February 19, 1987 Hearing, at 97, and defendant testified that he *understood* "cooperate" to mean "willing to testify." *Id.* at 110. Stern testified that Perrino told defendant, "if you testify, we would not indict you, we will not prosecute you. But you've got to agree to continue to do what you're doing." *Id.* at 127. In paraphrasing what he heard Perrino tell defendant, Stern testified that "[Perrino] was not going to prosecute them on the matter if they—or indict them if they would continue to be available and were willing to testify." *Id.* at 144. Similarly, Sears testified that "they told us in no uncertain terms they told us that, if we agreed to testify for them, that we would not be prosecuted." Transcript of March 26, 1987 Hearing, at 10. In response to

questioning by the court, however, Sears conceded that "willing to testify" is what he *understood,* but he did not remember exactly what was said at the end of the Portland meeting.

In contrast to the somewhat equivocal testimony of Sears, Stern and defendant, Perrino consistently testified that complete transactional immunity from prosecution would be given only if defendant actually testified for the Government. *See* Transcript of February 19, 1987 Hearing, at 29 ["if everything turned out to be truthful, ... I would probably be using him against two what I considered superior targets, and I would probably give him immunity from prosecution."]; *id.* at 35 ["I did say that I was interested in Mr. Morrell and Mr. Southerland; that I would need his testimony; and, that I would give him immunity for that in response to that testimony."]; *id.* at 36 ["I would be giving him immunity in return for his testimony."]; *id.* at 50 ["I was interested in prosecuting Morrell and Southerland; and, that I would be giving him immunity for that in return for his testimony."]. *See* also Defense Exhibit 1 [letter from Perrino to Stern, stating Perrino's recollection of Portland meeting that "it was decided that if we were to go forward with the case, that we would not prosecute, but rather give immunity to [defendant] and Mr. Sears *for their testimony"* (emphasis added).]

Although it is a close question, the literal testimony of the witnesses is more supportive of the Government's version of its agreement with defendant. All three defense witnesses testified that they "understood" that Perrino had offered immunity from prosecution in exchange for *willingness* to cooperate and *availability* to testify, yet no witness could recall just how Perrino expressed such an agreement. Indeed, Stern's recollection of what Perrino told defendant is more similar to Perrino's testimony: *"if* you testify, we would not indict you, we will not prosecute you." Transcript of February 19, 1987 Hearing, at 127. Considering the personal interest each defense witness has in this proceeding, however, it is not surprising that each

subjectively "understood" Perrino to be making a more favorable offer than any literal term of the agreement would support. Whereas, Perrino, who would seem to have considerably less interest in the outcome of this proceeding, *see* note 3 *supra*, consistently testified throughout the proceeding that complete immunity from prosecution was conditioned on defendant actually testifying.

Moreover, going beyond the witness' literal descriptions of the terms of the cooperation agreement, important considerations tip the scale decidedly toward the conclusion that the offer of complete immunity contemplated performance of the condition precedent that defendant actually testify. It is significant that the actual conduct of Stern and Perrino comports with the Government's version of the cooperation agreement. According to both Stern and Perrino, on numerous occasions Stern inquired of Perrino concerning the status of the Gulf King IV case, when defendant would be needed to testify, and also frequently reiterated that defendant was available to testify. Although these actions may be explainable simply as fulsome follow-through on the part of counsel acting in behalf of a cooperating defendant, if the terms of the agreement were as defendant contends, Stern's repeated inquiries and reassurances to Perrino went well beyond any actions necessary to serve defendant's interest. Indeed, if the cooperation agreement had been one of total immunity in exchange for mere availability to testify and willingness to cooperate, a simple letter or oral representation that defendant remained available and willing would have fulfilled defendant's obligations and would have left the onus with the Government. In such a scenario, Stern's repeated volunteering suggests that he sensed that there was a need for some stimulus to prompt the Government to act, perhaps by requesting defendant's testimony or, failing that, at least by requesting some other form of cooperation, in order to flesh out and breathe life into a transactional immunity agreement of a more favorable nature.

Of similar import is the evidence concerning the "Bangor meeting" in Stern's office, attended by Sears and defendant. The evidence established that sometime in 1985 the defendant and Sears travelled to Stern's office in Bangor for a meeting. Although not entirely clear on the point, it appears from Stern's testimony that defendant and Sears travelled to Bangor in response to a telephone call from Stern. *See* Transcript of February 19, 1987 Hearing, at 128–31; *see also id.* at 98 [defendant testified that "I believe six months or so after that meeting in Portland that me and Mr. Sears were contacted by Marshall Stern for another meeting in Bangor."]. The meeting was *not* at the request of Perrino, Bailey, Spaulding or any other Government agent or representative, and it is clear that the defendant and Sears did *not* meet with Bailey or any other representative of the Government. Thus, it appears that Stern brought defendant and Sears together on his own initiative.

The circumstances of the mailing of the letter of February 20, 1986, provide further support for such an interpretation of the evidence. Perrino testified that the February 20, 1986, letter to Stern was sent *at Stern's request.* In this respect Perrino's testimony went uncontradicted. Stern was present when Perrino so testified, and Stern testified *after* Perrino, yet Stern neither challenged nor offered any alternative interpretation of Perrino's testimony which might strip it of some of its highly damaging effect upon defendant's version of the terms of the cooperation agreement.

There never was any follow-up on the letter, by Perrino or any other representative of the Government. Thus, at the very least, it appears that Stern's instigation of the "Bangor meeting" and of the February 20, 1986, letter from Perrino, as well as his repeated inquiries and reassurances, were meant to serve as emphatic evidence that defendant at all times remained willing to testify and cooperate. Had defendant and Stern understood that the defendant already *had* earned complete immunity, by virtue of his *availability* to testify and his continuing *willingness* to cooperate, it is difficult to explain the repeated overtures

made by Stern *subsequent to* the Portland meeting.

Finally, the court finds that the absence of any *written* cooperation agreement supports the Government's view of the nature of the agreement. Stern may well be the most experienced member of the criminal defense bar of this court, particularly as concerns cases involving controlled substances. Although Perrino had considerable experience as a state prosecutor, he testified that this case was among the first, if not the first, criminal case assigned to him as an Assistant United States Attorney. Perrino's inexperience in federal criminal matters, and *multi-defendant drug cases in particular,* likely explains his failure to insist upon any record or memorialization of the cooperation agreement in this case. Considering Stern's extensive experience as defense counsel in such cases, however, the court finds it highly improbable that Stern would not have *insisted* on a *written* cooperation agreement if, in fact, the Government had extended transactional immunity to defendant conditioned solely upon defendant's availability and willingness to testify and cooperate.

Since the court finds that the offer of transactional immunity was conditioned upon defendant actually testifying, the court rejects the contention that it would be unfair to permit the present prosecution to proceed.

The court in no way condones the lax practice which bred the present misunderstanding. All counsel are well advised to make sure that plea agreements and cooperation agreements are *clearly* understood by all parties, *carefully* memorialized, and *fully* disclosed to the court as required by law, *see United States v. Daniels,* 821 F.2d 76 (1st Cir.1987). Yet use immunity is all the defendant bargained for and all the defendant is entitled to receive. The court will exercise its supervisory powers rigorously to insure that the use immunity granted defendant at the Portland meeting is respected.

Defendant's suggestion that he changed his position, or relied to his detriment on the statements made by Perrino at the *end* of the Portland meeting, is specious in light of the evidence that defendant had *no* further involvement with Government agents following the Portland meeting. Defendant had divulged all he knew about the Gulf King IV conspiracy *prior* to the end of the Portland meeting, under the grant of limited use immunity. If any conduct placed defendant at risk, it was his participation in the Portland meeting, not any action taken by defendant after the Portland meeting. Moreover, throughout the Portland meeting, defendant was represented by experienced defense counsel whose responsibility it was to protect defendant from any overreaching by Government counsel. The court is satisfied that no overreaching occurred.

## CONCLUSION

For the foregoing reasons, the court finds that the promise of transactional immunity was conditioned on defendant actually testifying against his alleged co-conspirators. Since defendant was never asked to testify and the indictment is based upon evidence obtained independently of defendant's disclosures at the Portland meeting, the motion to dismiss the indictment is *DENIED.*

SO ORDERED.