**UNITED STATES of America, Plaintiff,**

v.

**Rose E. VERGARA, Defendant.**

**Crim. A. No. 91–125.**

United States District Court,
N.D. West Virginia.

May 5, 1992.

William A. Kolibash, U.S. Atty., Wheeling, W.Va., for plaintiff.

Michael Benniger, Morgantown, W.Va., for defendant.

ORDER

MAXWELL, Chief Judge.

On November 12, 1991 a five-count Indictment was returned by the Grand Jury charging the above-named individual with conspiracy to possess with intent to distribute and to distribute marijuana (Count 1); two counts involving the use of a telephone to facilitate the distribution of marijuana (Counts 2 and 4); and, two counts of distribution of marijuana (Counts 3 and 5). The conspiracy is alleged to have occurred from the spring of 1989 to December 13 and 14, 1989; the substantive counts, on those referenced dates in December.

■ The facts presented reveal this to be one of those troublesome cases in which the government has placed itself in a position of compromise, its agents, with the approval of its attorneys, having negotiated with and enlisted the assistance of an unrepresented and uncharged cooperating individual. The recruitment was accomplished in an ambiguous manner, such that encouraged the individual to reasonably interpret the government's representations and actions as promises upon which she could rely. *See e.g., United States v. Sharp,* 927 F.2d 170 (4th Cir.1991).

The Court now considers the defendant's Motion to Dismiss the Indictment in which she urges that the referenced charges are violative of the government's promise not

to prosecute her. In consideration of the record herein, the Court is of the view that in exchange for the defendant's cooperation the government has promised that these charges would not be preferred against her. Accordingly, the referenced Indictment must be, and the same is hereby, DISMISSED.

On December 13 and 14, 1989 Greg Fleming and Richard Downes [1], members of the Narcotics Task Force operating under the direction of the United States Attorney for the Northern District of West Virginia, engaged the assistance of a pregnant confidential informant to purchase marijuana from the above-named defendant. At the officers' request, the pregnant lady made telephone calls to the defendant and thereafter went to the defendant's residence, a location alleged to be within 1000 feet of real property comprising a school, and purchased quantities of marijuana. On December 20, 1989 these Narcotics Task Force members, after having consulted with Assistant United States Attorney Robert McWilliams, paid a visit to the defendant, identified themselves as task force members, and asked to talk with her regarding drug trafficking activity. By the conclusion of that meeting the task force members had advised the defendant that the government had evidence that she had violated certain federal [2] narcotics laws, that they had been in contact with the United States Attorney's Office, and that it

would be to her advantage to cooperate with the government.[3] In addition, the officers obtained the defendant's signature on DEA Form 473 "COOPERATING INDIVIDUAL AGREEMENT" and provided her with a telephone number where they could be reached.

The cooperation began almost immediately. Within a day or two the defendant contacted the officers and arranged to meet them at a parking lot near her home. The officers "wired" the defendant with a recording device, gave her instructions regarding its use, and provided $160.00 for the purchase of "evidence." The defendant returned to her home and thereafter purchased an ounce of marijuana from a target she identified as Howard Messenger. Mr. Messenger also "fronted" the defendant an additional ounce of marijuana and after he had left her home, the defendant returned to the parking lot, delivered the marijuana and the recording device to the waiting officers, and signed a form indicating the disposition of police department funds. The form bears the date of December 22, 1989. The officers also arranged for the defendant to pay for the "fronted" marijuana.

Although the defendant testified that the government wanted her to make another, larger-quantity purchase from a drug supplier, these purchases represent the total number of the "buys" the defendant made for the government.[4] The defendant testi-

---

1. Fleming and Downes are police officers for the city of Morgantown, West Virginia; however, for purposes of this case, it is clear from their testimony that they were acting in their official capacity as members of the Narcotics Task Force.

2. Detective Fleming testified that the officers had not been in contact with the state's Prosecuting Attorney "[b]ecause at that time this was right after the April 29th round-up in Morgantown and the informant that we used was pregnant and also, this happened within a thousand feet of a school. So we spoke with Mr. McWilliams in reference to these matters and decided that we would like to have it taken federally and he agreed."

3. Detective Fleming testified that Ms. Vergara was advised that the extent of her cooperation would be made known to the Court. Officer Downes testified that she was advised that the

extent of her cooperation would be made known to the United States Attorney at some point in time when the charges were filed. Ms. Vergara testified that the officers had asked her to make drug purchases for them and had indicated that in exchange she would not be prosecuted.

4. Detective Fleming's testimony is instructive regarding the government's use of cooperating individuals:

Those are the only two occasions that she came to us.

.         .         .         .         .

Well, you got to understand something. It's not our point—it's not our place to go out and ask her to do something every time she needs to do something. We tell them, "You go and contact as many people as you can and set up as many deals with as many people as you can to further your assistance." I'm not going

fied that during this phase of her cooperation the officers indicated that she was not going to be charged; however, on cross examination the defendant explained that she was not explicitly told that she would *never* be charged. The exchange between the defendant and the Assistant United States Attorney is instructive:

Q Ms. Vergara, I am a little confused. Your testimony here to the Judge is that you were told you were not being charged with a crime, is that your testimony?

A It was indicated to me that I wouldn't be.

Q What is your testimony as to what you were told?

A That I could help myself.

Q Okay. Isn't it correct that you were told that you could help yourself, but no one ever said to you that you will not be charged?

A Those words were not used.

Q The words "you will not be charged" were not used. That's just what you assumed?

A I was told I was not being charged.

Q That's right, but you were never told that you would never be charged?

A No.

Ms. Vergara testified that she was subpoenaed to testify before the Federal Grand Jury in Elkins, West Virginia on April 10, 1990 and that the subpoena was served by Joel Smith, another Narcotics Task Force member and officer in the Morgantown Police Department. On the appointed day the defendant was present at 9:30 A.M. and waited until after 4:00 P.M. without having been called before the Grand Jury. The defendant testified that during the day Officer Fleming assured her that the object of the subpoena was information concerning Howard Messenger and that the government's inquiry would not require that she divulge information incriminating as to herself. The testimony of Officer Smith supports the contention that through the referenced subpoena the government sought testimony regarding the controlled buys which she had made from the referenced target.

The defendant also testified that near the end of the day Officer Downes advised that she should consult an attorney. *United States v. Vergara*, Miscellaneous Action No. 90–30–E, reveals that Ms. Vergara completed a financial affidavit dated April 11, 1990 and that Daniel F. DeBiase was appointed to represent her by order entered April 27, 1990 as of April 26, 1990. A "MEMO TO FILE" in that Miscellaneous Action is instructive:

Danny DeBias [sic] was originally called to represent Vergara when she was to testify before the Grand Jury, but since he couldn't talk to her until the following day, she was excused.

Magistrate Core was notified yesterday (4/26/90) that they were going to talk to her and try to work something out, do [sic] DeBias has been appointed using the same affidavit.

Thereafter the defendant received correspondence from Mr. DeBiase advising that due to his acceptance of employment with the Prosecuting Attorney, Monongalia County, West Virginia, he could not represent her.

Ms. Vergara testified that she was next subpoenaed to the Grand Jury in Elkins in January of 1991 and that she was again present as required. She testified that on that day she was privately interviewed by Officer Smith[5] and that when he began to ask questions which called for the defendant to incriminate herself, she declined to answer questions without an attorney being present.[6] Ms. Vergara then returned

to go out and pick her targets for her. That's her responsibility.

**5.** The Court would note that Officer Smith testified that he became a member of the Narcotics Task Force in July of 1990 and that he was not aware of her subpoena to testify before the Grand Jury in January of 1991. Officer Downes testified that he left the Narcotics Task Force in

October of 1990, but that he was present during both the April 1990 and January 1991 Grand Jury sessions when Ms. Vergara appeared.

**6.** The miscellaneous docket does not reveal that a request for court-appointed counsel was made regarding Ms. Vergara during the January 1991 session of the Grand Jury.

to the Grand Jury witness room where she remained for the day, again without being called to testify before the Grand Jury. According to Ms. Vergara's testimony, when the end of the day had arrived and it was suggested by Officer Smith that she remain overnight for testimony the following day and she had indicated that she could not do that, she was taken to see an Assistant United States Attorney.[7] Ms. Vergara recounted the meeting with Officer Smith and the Assistant United States Attorney:

> Well, when we went in there, Joel Smith said. "This woman has been here all day and she can't stay over night. We thought we would keep her until she can testify in the morning." The U.S. Attorney said, "I could detain you if I wanted to." And I just got very upset and started crying and I said, "I don't know what it is that you want from me. I only agreed to do everything you asked me to do—I agreed to testify and I have appeared both times and I sat here all day and I rearranged my whole life and whole schedule and each time you tell me something different. I can't stay in Elkins for I have a child at home." He said—he again told me that he could detain me if need be and I was crying and was real upset and I said, "I just don't understand what it is that you want from me." He said, "We would like for you to be a cooperative witness is what we want." I said, I am a cooperative witness. I have agreed to testify and I have agreed to everything." He said, "I'll tell you what. I'll give you two weeks to get in touch with Officer Smith because it can be noted here that you were an uncooperative witness and one way or the other we'll resolve these charges against you."

The defendant related that she then went home and, after a couple of days, called

Officer Smith and left a message with her new address and telephone number, but that he never got back in touch with her. The within Indictment was returned by the Grand Jury on November 12, 1991. Mr. Messenger was not contacted by the task force members, the evidence regarding the controlled buys Ms. Vergara allegedly made from him was not presented to a grand jury, and no Indictment was ever returned against him.

A statutory Special Grand Jury empaneled pursuant to the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922, codified at 18 U.S.C. §§ 3331–34, was in being and in session in this District on April 10, 11, and 12, 1990. The records of the Clerk of Court, which are maintained pursuant to the Order of this Court entered September 9, 1987[8] governing the reporting of persons subpoenaed to testify before grand juries in this District, reflect that Ms. Vergara arrived at the Clerk's office at 10:50 A.M. on April 11, 1990 and that she advised a Deputy Clerk that she had arrived at the United States Attorney's office at 9:00 A.M. and had been waiting in the interval to talk with Assistant United States Attorney Robert McWilliams. The Clerk's record further indicates that neither the government's attorneys nor its agents requested the opportunity to interview Ms. Vergara after she reported on April 11, 1991. The record does not reflect that Ms. Vergara was present on either April 10 or 12.

A regular Grand Jury was in being and in session in this District on January 15, 16, and 17, 1991. The records of the Clerk of Court regarding this session do not reflect that Ms. Vergara's name was included on the witness list supplied by the United States Attorney or that Ms. Vergara noted her appearance with the Clerk of Court on any of those days.

---

**7.** Officer Downes testified that he believed he was present when Assistant United States Attorney Thomas O. Mucklow was talking with Ms. Vergara; however, the officer was not able to detail that conversation. Presumably the United States Attorney knows when Ms. Vergara was subpoenaed to testify, the reasons she was not called before the Grand Jury, and the context of

the interviews which Narcotics Task Force members and/or the government's attorneys had with her; however, the government has not detailed the record in those particulars.

**8.** *In re: Grand Jury Witness Procedures*, Misc. No. 87–329.

Officers Fleming, Downes, and Smith were operating under the auspices of the United States Attorney for this District as members of the Narcotics Task Force. Prior to their contact with Ms. Vergara, Fleming and Downes had consulted with Assistant United States Attorney Robert McWilliams. Ms. Vergara was made to understand their federal affiliation: when they came to her door they advised her of their membership in the task force and, during the ensuing conversation, of their contact with the government's prosecutor. The government has not urged that the task force members lacked the authority to bind it.

That a cooperation agreement was struck between the task force members and Ms. Vergara is also clear from the record. An undated Cooperating Individual Agreement (DEA Form 473) signed by Ms. Vergara and witnessed by Officer Fleming is represented to have been executed at their first meeting on December 20, 1989. DEA Form 473 does not provide that the defendant will expose herself to the dangerousness inherent in making controlled buys for the government from her up-line distributor; however, it is undeniable that she did so under the authority and control of and in cooperation with Officers Fleming and Downes. Accordingly, it is clear that DEA Form 473 is but a part of a more comprehensive, unwritten agreement with the government in this case.

The Court now turns to a resolution of the more difficult question presented: Did the unwritten agreement between these parties include the government's promise that in exchange for her cooperation the government would not pursue criminal charges against her on the basis of the December 13 and 14, 1989 drug distribution to the government's pregnant confidential informant? If so, then the preferred charges must be dismissed for it is evident that the defendant has fulfilled her promise to make controlled purchases for the government. Moreover, at the government's command, Ms. Vergara was present to give grand jury testimony regarding this cooperation.

The government has suggested in its written response to the defendant's motion to dismiss that she failed to cooperate with the government because of her refusal to testify before the Grand Jury. However, the record reveals that she appeared on two separate days as required by Grand Jury subpoenas, that either the Special Grand Jury or a regular Grand Jury was in session when she appeared, that she remained in the corridors or the witness room during the entirety of each of these days, but that the United States Attorney did not call her to testify. Although it is clear that the government caused Ms. Vergara to appear in Elkins on a day in January of 1991 while the Grand Jury was in session, the witness list submitted by the United States Attorney reveals that the government did not contemplate her appearance before the Grand Jury on that day. The Assistant United States Attorney's unsupported assertion that "she refused to testify" is disingenuous at best.

The more troubling aspect of the question presented concerns the nature and extent of the incentive which the government offered in exchange for her cooperation. It has not been suggested that Ms. Vergara's cooperation with the government was unilateral. On the contrary, the testimony of the task force members, as clarified on cross examination, was that the government had promised that the extent of Ms. Vergara's cooperation would be made known to the Court or to the government's attorneys who would, in turn, make it known to the Court. The tenor of this testimony indicates that the government would characterize its promises in terms which would require it to advise the Court of the defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense pursuant to Chapter 5, Part K of the Sentencing Guidelines or Rule 35(b) of the Federal Rules of Criminal Procedure.

██ Recognizing that exigent circumstances not suggested to be present here may preclude the orderly efficiency of a clearly drafted cooperation agreement, the Court concludes, as it must, that in the

absence of an agreement, *"clearly* understood by all of the parties, *carefully* memorialized, and *fully* disclosed to the Court"[9], the government must bear the disadvantage of ambiguity or omission. *United States v. Harvey,* 791 F.2d 294 (4th Cir. 1986); *United States v. Garcia,* 956 F.2d 41 (4th Cir.1992). Although the government contends that its agents did not make the specific promise that Ms. Vergara would *never* be prosecuted for the distribution of controlled substances to the government's pregnant informant, neither did the government's agents, or more importantly its attorneys, specifically advise Ms. Vergara that she would be so charged. The vagueness of the government's arrangement with an uncounseled cooperating individual invites confusion.

That the terms of the unwritten cooperation agreement were ambiguous is, perhaps, best demonstrated through the direct testimony of Officer Downes. Defense counsel inquires:

Q When was it decided that charges would be lodged against her?

A I believe it was after I had left the—the task force and it was after October of ' '90.

.    .    .    .    .

Q And that decision wasn't made to your knowledge, at the time that you went to see her on 12–20–92—I mean, 12–20–89? Excuse me.

A We let her know that there would be charges pending, but not exactly when the charges would be filed.

.    .    .    .    .

Q She didn't know what she was facing, did she?

A I don't know. She seemed to be an intelligent person. We explained to her that, you know, what the possibilities were.

Q Well, what were the possibilities?

A That she could be charged.

.    .    .    .    .

Q And you made no definite statement that she would be, is that correct?

A In the—over the course of the conversation I'm sure she should have got the opinion that she would be charged.

Of course, Ms. Vergara testified that the government indicated that in exchange for her cooperation she would not be charged. The government knows how to enter into clearly written cooperation agreements with individuals who are called upon to provide assistance to the government. Cooperating individuals who are represented by counsel are routinely supplied with such an agreement. Moreover, where the government is dealing with an unrepresented individual, it knows how to use the commonly accepted practice of obtaining a written waiver of individual rights. Although the task force members were in contact with an Assistant United States Attorney prior to their meeting with Ms. Vergara, these safeguards were not suggested in this case; rather, the government has chosen to walk the more obscure path, dangling ambiguous, you-can-help-yourself promises to an unrepresented individual caught in the shadow of uncharged, undetailed, unclarified violations of federal narcotics laws.

Obviously, the expressed intent of the task force members was to obtain Ms. Vergara's assistance to "move up the ladder" in the narcotics distribution chain. The testimony of Officer Fleming and the government's informal dealings with Ms. Vergara support that conclusion. The incentive for Ms. Vergara to cooperate was to diminish the expressed possibility of criminal charges being filed against her. The government's lawyers are experienced prosecutors who understand that it is the natural tendency of cooperating individuals to view their cooperation with the federal government to be directed at other players and not themselves. Besides, the government's agents and subpoenas represented as much to Ms. Vergara. The apparent thrust of the government's effort was Howard Messenger or some other more far-reaching up-line distributor or dealer. Ms. Vergara, under the expressed jeopardy of being a potential defendant herself, was

---

**9.** *United States v. Gianakakis,* 671 F.Supp. 64, 72    (D.Me.1987) (emphasis in original).

willing to alleviate that threat by helping the government bring a more substantial distributor to justice.

■ Where the government clearly intends, as it has urged here, to effect its policy of charging cooperating individuals[10] and such individuals are willing to cooperate nevertheless, the risk of misunderstanding is high. As suggested by the District Court in *Gianakakis*, the cost of avoidance of the risk inherent in nebulous agreements is comparatively low. Where the government has chosen not to memorialize the terms of such an agreement, it may not wield the imprecision or ambiguity to its advantage.

This is especially true where the government obtains an unwritten cooperation agreement with an uncounseled individual. The finding of such an agreement need not be determined strictly from the recognized body of commercial contract law; the Court must also consider the defendant's constitutionally-based "contract" right and must weigh in the "concerns for the 'honor of the government, public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government.'" *Harvey*, 791 F.2d at 300 (citations omitted).

Accordingly, the Court finds that the government has promised to forego the pursuit of criminal charges against Ms. Vergara flowing from her distribution of marijuana to its pregnant informant in exchange for her cooperation in the investigation and prosecution of an up-line distributor, *e.g.*, Howard Messenger. The government, now the benefactor of that cooperation, may not unilaterally renege on its bargain. That determination envisions, of course, that should the government now choose to present its evidence regarding Howard Messenger to the Grand Jury it would be entitled to the cooperative testimony of Ms. Vergara.

---

**10.** The testimony of Officer Fleming on the government's cross-examination is pertinent:

Q  But in this time period, particularly in this time period, you were working to a great extent with the United States Attorney's Office regarding controlled buys that you have made, have you ever been instructed to tell an individual that they would not be prosecuted?
A  No, Ma'am.

Q  Have you ever told a cooperating witness that they would not ever be prosecuted?
A  No, Ma'am.
Q  In fact, what is the policy regarding the prosecution of cooperating witnesses?
A  They will—a cooperating individual will still be charged within the extent of their cooperation. Their cooperation will be made known to the Court.