UNITED STATES of America, Plaintiff,

v.

Amy Frances JOHNSON, Defendant.

Cr. No. 4–87–120.

United States District Court,
D. Minnesota,
Fourth Division.

April 28, 1989.

Douglas R. Peterson, Asst. U.S. Atty., for U.S.

Philip G. Villaume, St. Paul, Minn., and John W. Lundquist, Minneapolis, Minn., for Amy Frances Johnson.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Defendant Amy Frances Johnson was charged in a three-count indictment with possession with intent to distribute cocaine and distribution of cocaine. Johnson waived her right to a jury trial and tried her case to the court. She was convicted on each count on January 29, 1988. Defendant appealed and on November 9, 1988 the Court of Appeals reversed and remanded with directions. *United States v. Johnson,* 861 F.2d 510 (8th Cir.1988). The Court of Appeals held that it was error not to have held an evidentiary hearing on defendant's motion to dismiss the indictment. Defendant argues that she is entitled to specific performance of an agreement that she not be prosecuted in federal court in exchange for her cooperation. The case was remanded for this court to determine whether the agreement defendant believes she had with the government existed, whether the government breached it, and whether any factors exist to make specific performance inappropriate. *Id.* at 513–14.

An evidentiary hearing was conducted over three days in January 1989. Testimony was received from defendant, attorneys who represented her in negotiations with the government, the Assistant United States Attorney who negotiated with Johnson's attorneys, and the police officers who interviewed her. After the hearing, a transcript was prepared, and the parties then briefed their positions. The court now having considered all the evidence and arguments and having evaluated the demeanor and testimony of the witnesses, makes the following findings of fact and conclusions of law in memorandum form.[1]

I.

Amy Frances Johnson[2] sold one-half ounces of cocaine to an undercover Minneapolis police officer on both September 28 and 29, 1987. She was arrested after the sale on the 29th. A search of her home revealed further quantities of cocaine (2.22 ounces), a handgun, an O'Haus scale, two containers of inositol, and $6,000 in cash. Johnson was arrested and taken to jail.

After her arrest Johnson disclosed to officers some information regarding her involvement in drug purchases and sales. She also attempted to make a monitored phone call to a drug contact, but was unsuccessful. The officers were particularly interested in two areas. Johnson is a registered nurse and until shortly before her arrest had worked at the Hennepin County Medical Center. The officers believed that she had sold drugs to hospital coworkers and had removed narcotics from the hospital. The officers were also interested in Johnson's sale of drugs to a uniformed

---

1. At the hearing, the court reserved ruling on the admission of several exhibits until they could be examined and considered. The court now rules that objections to the following exhibits are overruled and the exhibits received: defendant's exhibits 1, 2, 3, 4, and 6; government's exhibits 2, 3, and 5.

2. Johnson has married since the indictment was issued. Her correct name is now Amy Frances Rogers, but the parties and the court have continued to use the name Johnson for continuity and clarity.

Minneapolis police officer and her use of drugs with that officer.

Shortly after her arrest she retained attorney Bruce Hanley to represent her. It was Hanley's opinion that the evidence against Johnson presented a good case for the prosecution and that it was in her interest to attempt to have the charges brought in state court rather than federal court. After considering his advice Johnson informed Hanley that she wished to cooperate.

Assistant United States Attorney Jon Hopeman spoke by phone with Hanley on October 2, 1987 and discussed possible cooperation by Johnson. Hopeman told Hanley that the police might be interested in receiving from Johnson a full account of her drug-related activities.[3] Hopeman stated that any statements by Johnson would not be used against her at trial and would not be used to develop evidence against her. The agreement reached between Hopeman and Hanley was that if Johnson gave full information of her drug-related activities candidly and truthfully, then Hopeman would consider referring the prosecution to state court. In order to show her good faith and interest in cooperating, Johnson was to initiate the contact with officers Baltzer and VandeSteeg. After her cooperation, Hopeman would make the decision whether to seek federal indictment or refer the case to state court, and he would rely on the officers' assessment of Johnson's candor. The testimony of both Hanley and Hopeman shows that that was the only agreement entered. There was never any definite promise that Johnson's case would be referred to state court if she cooperated.

Hanley has a policy of not generally representing clients who cooperate with the government. Soon after Johnson agreed to cooperate, Hanley referred her to attorney Philip Villaume. Villaume conferred with Hanley about the agreement regarding cooperation. Villaume testified that he understood from Hanley that if Johnson cooperated with the police by meeting with them and answering their questions, then the criminal matter would be referred to state court. Johnson testified that she understood from Villaume that the agreement contained this definite promise. Both Johnson and Villaume formed their understanding from Hanley's description of the agreement he had negotiated with Hopeman. It appears that something was inadvertently lost in translation or interpretation.

In mid-October Villaume contacted Hopeman regarding Johnson's cooperation. Hopeman repeated the same terms—that Johnson had to initiate the contact with the officers, and that if she testified fully, candidly, and truthfully, he would consider referring prosecution to state court. On November 2, 1987, Villaume again called Hopeman. He asked whether the opportunity to cooperate was still available. Hopeman told him that any meeting would have to take place that day since he was scheduled to present the matter to the federal grand jury the next day on November 3, 1987, and intended to seek an indictment. Villaume understood that Johnson would be required to provide more than bare facts—that she would be required to give full, forthright, and candid testimony about all aspects of her drug-related activities.

Johnson met with Officers Baltzer and VandeSteeg in the late afternoon of November 2, 1987. Villaume was not present and did not ask to attend, nor was Hopeman present. The officers made no promise to Johnson that by her cooperation she could avoid federal indictment. She was questioned about several topics: her drug sources, cocaine and marijuana sales—including sales to hospital co-workers, her removal of narcotics from the Hennepin County Medical Center, her relationship and drug activities with David Hibbin, and her knowledge of drug use by a uniformed police officer. During the meeting Johnson made clear that she would not participate in any undercover drug transactions

---

**3.** Hopeman never spoke with Johnson about a possible agreement. All negotiations took place between Hopeman and Johnson's attorneys.

or make further phone calls to try to set up drug transactions. The meeting lasted a little more than one hour.

Baltzer and VandeSteeg, who were both present for most of the meeting, expressed frustration with Johnson's lack of candor throughout the session. They testified that getting information from her was "like pulling teeth." She volunteered very little and only provided brief answers to pointed questions. She frequently appeared reluctant to give information on a topic until the officers revealed they knew something about it and could determine that she was holding back information. During the meeting the officers told Johnson that she was not cooperating fully and was not telling them all she knew.

By the end of the meeting, the officers believed that Johnson was not being truthful in several regards. Johnson discounted her role in drug dealing with David Hibbin who had formerly lived with her and dealt drugs from her home. She stated that her drug dealing in 1987 was an effort to pay Hibbin's debts, although she later stated and testified that by 1987 she had broken off the relationship with Hibbin, that he had left her home, and that she had sought a restraining order against him. The officers believed that by 1987 she had taken the lead in initiating drug sales for her own benefit. They knew that she had made two cocaine sales to an undercover officer, and they knew that cocaine, a weapon, and drug dealing equipment were found in her home in September 1987. The officers did not believe Johnson's initial explanation that she first inadvertently removed narcotics from the hospital and took more only at Hibbin's insistence. They also doubted Johnson's truthfulness regarding her knowledge of drug use by the uniformed officer since her statements differed from other information the officers had. At the end of the meeting the officers advised Johnson that they thought she was holding back much information. They then reported to Hopeman that they did not believe Johnson had been fully candid or truthful.

Immediately after the meeting, Johnson returned to Villaume's office and prepared from memory a summary of the questions and answers she had given. She told Villaume that the officers would not promise to refer her case to state court. Villaume did not inquire of the officers or Hopeman how the meeting had gone or about Hopeman's plans to seek an indictment. Villaume testified that he was concerned about whether federal charges would be brought, but he did not call Hopeman to discuss it.

Hopeman went to the federal grand jury on November 3, 1987 and obtained an indictment. Hopeman's decision to seek federal charges was based on the perceived lack of candor and truthfulness during Johnson's interview rather than on her refusal to participate in undercover work.

## II.

■ The first determination the court must make on remand is whether an agreement existed between the parties, and if so, what it was. "[A] cooperation-immunity agreement is contractual in nature and subject to contract law standards." *United States v. Brown,* 801 F.2d 352, 354 (8th Cir.1986). Defendant claims that she negotiated an agreement not to be prosecuted in federal court in exchange for cooperation. Unlike the agreement disputed in *United States v. Brown,* there is no written agreement here setting forth the mutual promises.

The testimony received from the parties to the negotiations, particularly Hanley and Hopeman, makes it clear that the parties did not agree to the terms Johnson alleges. The government's only promise was to consider referring the matter to state court if Johnson candidly and truthfully told the officers what she knew. There was never a definite agreement to refer prosecution to state court which would entitle Johnson to specific performance. *Cf. United States v. Minnesota Mining and Manufacturing Co.,* 551 F.2d 1106, 1111 (8th Cir.1977) (explicit promise to refrain from prosecution in exchange for guilty plea to misdemeanor charge).

Johnson's apparent misunderstanding of the agreement seems to have arisen from miscommunication between her attorneys.

It was evident from the testimony that Villaume sincerely believed that Hanley and Hopeman had negotiated a firm commitment to forgo federal prosecution in exchange for Johnson's cooperation. The total evidence shows that their agreement was something less than that. The evidence also shows that Villaume did not himself negotiate such an agreement with Hopeman after Villaume took over Johnson's defense.

### III.

■ The government did not breach the agreement reached. The agreement was that the government would consider referring the matter to state court if Johnson was truthful and candid. The government fulfilled that promise. The result was, of course, not what Johnson had hoped. The government provided the opportunity for Johnson to meet with the officers even though her lawyer did not request a meeting until the day before the case was scheduled to go to the grand jury. After this meeting, Assistant U.S. Attorney Hopeman talked with the officers and decided that she had not kept her part of the agreement. He decided not to refer the case to state court but to seek a federal indictment after he considered the matter.[4]

### IV.

■ Even if there had been a firm and enforceable agreement in the terms which Johnson alleges, dismissal of the federal charges would be inappropriate under all the circumstances. If a firm agreement had been entered, the government would have had the burden of proving that defendant failed to satisfy her part of the deal. *United States v. Brown,* 801 F.2d at 355. The sufficiency of cooperation is a factual matter for the Court. *United States v. Johnson,* 861 F.2d at 513, *citing United*

*States v. Brown,* 801 F.2d at 355; and *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). The most important consideration is the truthfulness of the proffered statements and their incriminating nature, not the amount of information or utility to the government of the information provided. *Id.* at 513, n. 3.

Through the evidence adduced at the hearing, the government has met its burden of proving that Johnson failed to cooperate in the manner she had promised. The information Johnson provided to the officers was contradictory in part, and she was often less than candid and forthright. She minimized her role in cocaine dealing and the taking of drugs from the hospital, and she was reluctant to admit to facts. Therefore, even if there had been the agreement Johnson alleges, specific performance would be unavailable to her. *See United States v. Brown,* 801 F.2d at 355 (specific performance unavailable if defendant breaches agreement).

Johnson argues that the consequences of her being convicted on the federal indictment are unduly harsh. It is possible that she could have resolved any charges brought in state court without a sentence of confinement and perhaps with eventual dismissal. After her conviction in federal court, she was sentenced to six months with work release privileges. While this might be a greater sentence than she would have received in state court, it is not a harsh sentence for serious drug offenses. No state prosecution has been brought, and none apparently is planned. The decision to pursue federal charges was made in good faith, and it would have an adverse impact on the public and the criminal negotiation process to dismiss the indictment where the defendant has not fulfilled her

**4.** The Court of Appeals in its footnote 2 instructed the court to consider carefully whether the government had adequate time before seeking indictment to evaluate Johnson's candor. Much testimony was received on this issue. Johnson delayed for over one month before contacting the police, and then did so only after learning that the government was planning to seek an indictment the next day. The officers nonetheless met with her for over one hour. Hopeman conferred with officers Baltzer and VandeSteeg several times on November 2 and again on November 3 before going to the grand jury. The record shows that the government had adequate time to evaluate Johnson's candor and did not rush to indictment without doing so.

part of the agreement. Under all the circumstances, there is no unjust result.

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that defendant's motion to dismiss the indictment is denied and the judgment of conviction should be reinstated.