UNITED STATES of America,

v.

Gary R. LaTRAY and Timothy C. DeMarc, Defendants.

No. 89–CR–110.

United States District Court, N.D. New York.

June 5, 1990.

Frederick J. Scullin, Jr., U.S. Atty. (Andrew T. Baxter, Asst. U.S. Atty., of counsel), John A. DeFrancisco, Syracuse, N.Y., for defendant Gary R. LaTray.

Myers, Rose and Flynn, P.C. (Gregory B. Flynn, of counsel), Syracuse, N.Y., for defendant Timothy C. DeMarc.

### MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

The indictment returned in this case charged defendants Gary LaTray and Timothy DeMarc with robbing an armored truck facility in East Syracuse, New York on May 25, 1989. Specifically, they are alleged to have conspired to commit robbery by force and violence or intimidation; they are charged with the substantive crime of bank robbery by force and violence or intimidation; and, finally, both defendants are charged with assault in a crime of violence through the use of a handgun. The armored truck facility which was robbed was operated by AMSA Courier Service ("AMSA"). The conspiracy count of the indictment alleges that the defendants were assisted by an AMSA employee, Thomas Lester.

Both defendants were apprehended by agents of the Federal Bureau of Investigation ("FBI") in Virginia Beach, Virginia on the night of May 30, 1989, five days after the heist. The defendants, without any counsel, made an initial appearance before then-Magistrate Rebecca Beach Smith on May 31, 1989. They later appeared with counsel before Magistrate Smith on June 5, 1989, at which time they both waived detention and preliminary hearings. The defendants were then ordered removed and transported to the custody of this court.

On May 2, 1990, this court held a hearing to resolve one motion presented by defendant DeMarc and two brought by defendant LaTray. In his motion, DeMarc seeks to suppress any statements he made between the time of his arrest and when he was read his rights from an "Advice of Rights" form which he signed. Exhibit ("Exh.") 1. LaTray contests the propriety of his arrest, claiming that the arresting agents lacked probable cause when arresting him. He asserts that, if the arrest was improper, the court should suppress "all statements obtained from him and property seized from him." LaTray Memorandum, Docket Number ("Doc.") 23, at 8. LaTray also moves to dismiss the indictment insofar as it charges him with armed robbery. He contends that, as part of a bargain to obtain information from him regarding the location of some currency, the government agreed not to press any charges with respect to guns. Therefore, LaTray argues that he should be charged with larceny, as opposed to armed robbery.

### I. DeMARC'S MIRANDA RIGHTS.

DeMarc was arrested at approximately 10:45 p.m. on May 30, 1989 at the Holiday Inn Oceanfront, Virginia Beach, Virginia. *See* Exh. 11 (Arrest Log for DeMarc). Prior to the arrest of DeMarc, LaTray was arrested outside the Holiday Inn. After the arrest of LaTray, FBI agents formulated a quick plan to arrest DeMarc, whom they believed to be in his room. Several approached DeMarc's room, number 602. One agent, Special Agent James Cross, knocked on the door and claimed to be the manager. The door was opened from the inside and the agents entered.

DeMarc claims that when the agents entered the room he had finished smoking a marijuana cigarette within the hour and had recently taken two "hits" off of another. The room had several individuals in it. DeMarc testified at the hearing that when the agents entered they announced, "FBI."

They told him that he was "under arrest for armed robbery." One of the arresting agents, Special Agent James Myers, testified that defendant DeMarc identified himself as DeMarc. Agent Myers recollected that DeMarc volunteered, "You guys are good." Agent Myers further testified that, while yet in room 602, DeMarc volunteered that "anything you are looking for is in the black limo."

Agent Myers, and Special Agent Bowers escorted DeMarc to an FBI vehicle in the parking lot. Once inside the vehicle Agent Myers advised DeMarc of his right to remain silent and his right to an attorney. The agents drove DeMarc to the second precinct house of the Virginia Beach Police Department. Because there was not sufficient room at the second precinct, the agents transported DeMarc to the Virginia Beach Police Department Headquarters. In route to the headquarters, Agent Myers testified that DeMarc volunteered, "All I have to say is Petey did it all." DeMarc denied this when he took the stand.

At the headquarters, DeMarc read and was read an advice of rights form. DeMarc signed the form at around 12:50 a.m. on May 5, 1989. Exh. 1. Agents Bowers and Myers witnessed DeMarc's signature. The first section of the advice of rights form is entitled, "Your Rights." That section of the form advised DeMarc of his right to remain silent, that anything he said could be used against him in court, that he had a right to an attorney before any questioning, that if he could not afford an attorney one would be appointed, and that he had the right to stop answering at any time until he spoke with an attorney. The form next contained a section labelled, "Waiver of Rights." This portion of the form explained that the defendant had read and understood his rights, that he was willing to make a statement and answer questions, that he understood what he was presently doing, and that he had not been subjected to promises, threats, pressure or coercion. The signature line which defendant signed is located directly below the "Waiver of Rights" portion of the form.

Agent Myers testified that, after DeMarc signed the form, he answered a few background questions posed by the agents. Then, however, the defendant asked to speak with an attorney. The interview was halted.

Defendant DeMarc's testimony differs only slightly from that of Agent Myers. Some of DeMarc's testimony has already been set forth regarding the FBI's entry into his hotel room. Under cross-examination of Assistant U.S. Attorney Andrew Baxter, DeMarc agreed that he had told agents, "Whatever you're looking for is in the black limo." He also agreed that he told them, "I hadn't expected it so soon." Furthermore, he admitted under cross-examination that the federal agents had not asked him any questions to elicit those two statements.[1] Moreover, on cross-examination Baxter extracted from DeMarc that he (DeMarc) understood his rights when they were informally given to him in the FBI vehicle and when they were formally read to him in the Virginia Beach Police Department Headquarters. The one major departure from Agent Myers' testimony has already been mentioned. DeMarc denied commenting that "Petey did it."

As noted earlier, defendant DeMarc asserts that any statements he made up until the time he signed the advice of rights form should be suppressed. He argues that they should be suppressed because he was not properly advised of his *Miranda* rights until that time. The court does not agree with the defendant's argument.

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), set forth procedures to be utilized by the police "before commencing custodial interrogation." *Duckworth v. Eagan*, —— U.S. ——, 109 S.Ct. 2875, 2879, 106 L.Ed.2d 166 (1989). Statements made during custodial interrogation "are inadmissible unless the suspect is specifically warned of his *Miranda* rights and

---

**1.** There was no evidence that DeMarc's statements were given in response to the functional equivalent of interrogation. *See Rhode Island v.* *Innes,* 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

freely decides to forgo those rights." *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984).

■ In the case at bar, there was no evidence placed before the court that the statements which defendant seeks to suppress were made during custodial interrogation. They may have been made while Demarc was in custody of the FBI. *See Duckworth*, 109 S.Ct. at 2879 (*"Miranda* has not been limited to stationhouse questioning."). However, the only evidence before the court is that the statements attributed to DeMarc were volunteered. The Court in *Miranda* addressed the question of volunteered statements. It held that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. at 478, 86 S.Ct. at 1630. Accordingly, the court denies DeMarc's motion to suppress any statements made prior to the time he signed an advice of rights form on May 31, 1989.

## II. PROBABLE CAUSE FOR LaTRAY'S ARREST.

■ Defendant LaTray contends that he was arrested without probable cause and that any statements he gave or evidence seized as a result of his arrest should be suppressed. This motion is prompted by an apparent misidentification during LaTray's arrest in Virginia Beach. At the hearing before this court, defendant LaTray testified that on the evening of May 30, 1989, he was approached by two agents in suits outside the Holiday Inn as he was standing by a white stretch limousine. They stated, "FBI, you're under arrest." LaTray next asserted that one of the FBI agents, a black man, asked him, "Are you the limousine driver?" The defendant responded, "No." The FBI also arrested the driver of the limousine and held him in custody for over half an hour.

At the hearing before this court, the government did not expressly contest that one of the FBI agents asked LaTray if he was the limousine driver. Although as described below, the government witnesses implicitly denied LaTray's contention. Agent William Brown, one of the agents who arrested LaTray, testified for the government regarding the arrest of LaTray. According to his testimony, he and other FBI agents attended a meeting with regard to apprehending the defendants. At that time he was given a memorandum detailing the defendants' most recent activities. Exh. 5. The memo stated that the defendants had rented limousines and were headed for the Holiday Inn Oceanside. It stated that LaTray was traveling under the name of "Ross Thompson." Attached to the memorandum was an addendum, describing the physical features of both defendants.[2] In addition, Agent Brown received at that briefing a telefaxed copy of a photograph of LaTray. Exh. 6.

When the agents arrived at the Holiday Inn, the bellhops told them that the person in the white limousine was leaving. The agents were informed by the bellhops that Ross Thompson was "in that limo." Given the circumstances, Agent Brown's superiors told him and his fellow FBI agents to arrest LaTray/Thompson. Agent Brown testified that as the agents approached the limousine, LaTray was at the wing door of the white limousine. He was either loading or unloading luggage or a brief case. Another individual stood at the trunk. Agent Brown believed he knew that the individual at the wing door was LaTray because of his size (height and weight) and the color of his hair. The other individual at the white limo, according to Agent Brown, was heavier and larger than the person described in

---

**2.** The addendum described LaTray as follows:

| | |
|---|---|
| Name | Gary LaTray |
| Alias | Ross Thompson |
| Race | White |
| Sex | Male |
| Date of Birth | 2/16/59 |
| Height | 6 feet |
| Weight | 165 |
| Hair | Brown |
| Eyes | Blue |

| | |
|---|---|
| Characteristics | Hair shorter than in photograph and beard and mustache have been [ ] shaven off |
| Weapons | Armed with 9mm handgun |
| Clothing | Dressed in lot of new suits[,] lots jewelry, shiny black pointed Italian shoes |

the memo as LaTray. When he took the stand, LaTray admitted that the driver was heavier than he.

After he was arrested, FBI agents asked LaTray if he would consent to a search of his hotel room and the limousine. LaTray refused to give his consent. Accordingly, on May 31, 1989 the FBI obtained warrants from a U.S. Magistrate to search LaTray's hotel room and the limousine. Presumably, probable cause in the search warrants was based in part on information gained during LaTray's arrest.

The arrest of both defendants was premised upon arrest warrants and a complaint filed in the Northern District of New York. The complaint, which FBI Special Agent Donald Greene swore to before Magistrate Gustave J. DiBianco of this district, charged the defendants with robbery by force, violence and intimidation, and assault in a crime of violence through the use of a handgun. Agent Greene's complaint set forth several facts in support of its allegation that the defendants had committed armed bank robbery. Exh. 4. First, it reported that James Lester, an AMSA employee, told law enforcement officials that he had planned the robbery with two individuals, "Pete" and "Tim." Lester told these officials that Pete and Tim crashed through the garage door of the AMSA facility and that Pete brandished a handgun during the robbery. It further reports that Lester identified a photograph of LaTray as the man whom he knew to be "Pete." Lester identified a photograph of DeMarc as the man he knew as "Tim." The complaint also summarized the statement of an individual named Jacqueline Smith. She informed law enforcement personnel that LaTray called her at 1:30 a.m. on May 25, 1989 and told her to leave her back door unlocked so that he could leave a package for Lester. Later that day Smith found in her house a package which contained $25,000 cash.

The court does not understand LaTray to challenge the complaint as insufficient for lack of probable cause. In any event, the complaint contained the requisite probable cause. Probable cause is based upon the facts contained in the complaint. *Dirienzo v. United States,* 690 F.Supp. 1149, 1156 n. 6 (D.Conn.1988). The relevant question is whether the facts and circumstances within Agent Greene's knowledge and the facts of which he had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that LaTray had committed the offenses recited in the complaint. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). The information provided by Lester is reliable because he was a participant in the crime. *United States v. Jackson,* 560 F.2d 112, 121 (2d Cir.), *cert. denied,* 434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977). That information adequately supports the charges in the complaint. The complaint, and the warrants based thereupon, were validly issued.

Defendant LaTray's argument appears to be that, since he was originally wrongly identified as the driver and since the driver was also arrested, the government did not possess sufficient probable cause to arrest him. Pursuing a fruit of the poisonous tree argument, defendant contends that this court should suppress the evidence gained based upon the arrest and the subsequent statements given by the defendant. The Supreme Court has indicated the contrary. In *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the Court upheld the search of an apartment even when the police, without a warrant, arrested a man in the apartment, where the man arrested fit the suspect's description, but was not the suspect. In the instant case, the facts more forcefully support a position for upholding the subsequent seizures and not suppressing the defendant's statements. Here, the person arrested was indeed the suspect. *Cf. New York v. Harris,* — U.S. ——, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (declining to exclude the state's use of a statement made by the accused outside of his home, even though the statement was given after an arrest, based upon probable cause, which was executed in violation of the fourth amendment in the home of the accused).

■ When law enforcement officials make arrests, "[e]rrors there will be." *United States v. Allen,* 629 F.2d 51, 54 (D.C.Cir.1980). If the identification of an arrestee at the time of arrest is inaccurate, however, the court need not automatically conclude that the arrest was effected without probable cause. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (§ 1983 action). In the instant matter, defendant was arrested on a valid warrant, based upon a valid complaint, both of which named him. Any momentary confusion as to LaTray's identity at the time of arrest does not render the arrest invalid.[3] Defendant LaTray's motion to suppress evidence and statements because he was arrested without probable cause is denied.

## III. THE COOPERATION AGREEMENT.

Defendant LaTray contends that the government may not prosecute him for armed robbery on account of an agreement which he and the government reached in Virginia. The government's position is quite the contrary. Agent Cross testified that he was present on June 5, 1989 during a conversation between LaTray's attorney in Virginia, Alfred Tripp, Esq., and Robert Seidel, an Assistant U.S. Attorney in the Eastern District of Virginia. Agent Cross testified that Tripp and Seidel agreed that LaTray would inform federal agents where to recover the stolen money not yet in the government's possession. The government, as a result, would not prosecute LaTray for certain crimes in the Eastern District of Virginia. Agent Cross expressly remembered that the government did not promise that the statements given by LaTray would not be used in any prosecution in the Northern District of New York. The agreement between Tripp and Seidel was formalized in a letter dated June 5, 1989

which Seidel sent to Tripp. The letter stated that in exchange for LaTray's cooperation LaTray would not be charged in the Eastern District of Virginia with possession of narcotics, possession of a firearm, interstate transportation of stolen property and unlawful flight to avoid prosecution. Exh. 8. LaTray, as requested and agreed to, provided a statement to Agent Cross on June 5, 1989.

At the hearing before this court LaTray presented a version of the events surrounding the agreement which, naturally, favored his request for relief. On the stand, he asserted that his attorney, Tripp, told him if he gave a statement he would not be prosecuted for any crimes relating to a gun. LaTray claimed that his lawyer told him he would only be charged with stealing money. LaTray further testified that he was not present during the conversation between Tripp and Seidel which Agent Cross witnessed. LaTray maintained that he never saw the letter agreement, Exh. 8, until after he left Virginia.

Under cross-examination LaTray asserted that the Magistrate in Eastern District of Virginia, Rebecca Beach Smith, did not provide him with a copy of the complaint executed by Agent Greene, which alleged that LaTray had committed robbery by force, violence and intimidation, and assault in a crime of violence through the use of a handgun. LaTray indicated that he had no reason to believe that armed robbery charges would remain pending after he gave government agents a statement regarding the whereabouts of bags of cash. He supported this assertion by maintaining that he did not realize that armed robbery charges were already pending against him when he was arrested. According to LaTray, Magistrate Smith neither read the complaint to him, nor advised him that arm-

---

**3.** LaTray's own testimony is that he told the agents that he was not the driver. This was in effect an admission that he was Ross Thompson or Gary LaTray. The arresting officers could reasonably rely on LaTray's statement that he was not the driver.

Moreover, the fact that both the driver and LaTray were originally taken into custody does not destroy probable cause. The Restatement

(Second) of Torts § 119, comment j (1965), is instructive in this regard. It states:

A sees B and C bending over a dead man, D. B and C each accuse the other of murdering D. A is not sure that either B or C did the killing, but he has a reasonable suspicion that either B or C killed D. A is privileged to arrest either or both.

ed robbery charges were pending against him. Furthermore, he testified that he did not see a copy of the complaint until he was brought back to the Northern District of New York. Lastly, LaTray claimed on cross-examination that Tripp understood there was only one charge pending against him (LaTray) and that Tripp did not inform LaTray that he was facing armed robbery charges.

After the hearing, this court of its own accord decided to obtain the tapes of the proceedings where the defendants appeared before Magistrate Rebecca Beach Smith. In obtaining those tapes the court engaged the assistance of Magistrate Gustave J. DiBianco of this district. Tapes of the May 31, 1989 and June 5, 1989 proceedings before Magistrate Smith were forwarded to Magistrate DiBianco, who in turn forwarded them to the chambers of this court. Certifications of authenticity executed by a deputy clerk accompanied the tapes.

■ This court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir.1979); *see* Fed.R.Evid. 201; *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir.1989); *United States v. Gorham*, 523 F.2d 1088, 1096 (D.C.Cir.1975), *upon pet'n for reh'g*, 536 F.2d 410, 415 n. 6 (D.C.Cir.1976); *see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 857 n. 19, 102 S.Ct. 2182, 2190 n. 19, 72 L.Ed.2d 606 (1982). In accordance with this rule, the court takes judicial notice of the taped recordings of the proceedings before Magistrate Smith.

Those recordings directly contradict one portion of defendant LaTray's testimony. They show that, during defendant LaTray's initial appearance on May 31, 1989 before Magistrate Rebecca Beach Smith, she twice informed him that he was charged with armed robbery in the Northern District of New York. Nevertheless, in accordance with LaTray's testimony, there is no indication in the recording of the initial appear-

ance that the defendant LaTray received a copy of the complaint. Additionally, the recording of the appearance on June 5, 1989 does not indicate that the defendant LaTray received a copy of the complaint.

As the court embarks on the legal discussion of LaTray's second motion, the difficulty of the present decision is explained by language employed by the Second Circuit in its decision in the case of *United States v. Barnes*, 604 F.2d 121, 150 (2d Cir.1979).

The practice of reducing [cooperation] agreements to writing has grown out of situations which have frequently arisen in which there have been disputes as to the terms of oral understandings on the subject. The writing presents the opportunity for both parties to know the exact nature of their commitments.

*Id.* at 150. Granted, in the instant case the court has been presented with a letter formalizing the cooperation agreement reached between the government and defendant LaTray. However, that letter is dated the same day as when LaTray gave his statement to Agent Cross. There was no testimony on the subject of whether that letter was delivered to Tripp, LaTray's attorney, before or after LaTray gave his statement. The only evidence adduced on the subject was LaTray's statement that he never saw the letter until he returned to the Northern District of New York.

■ While the court recognizes the exigent circumstances facing the agents who procured LaTray's statement, the words of Chief Judge Cyr of the District of Maine nonetheless serve as a sound reminder for the future handling of cooperation agreements. "All counsel are well advised to make sure that ... cooperation agreements are *clearly* understood by all parties, *carefully* memorialized, and *fully* disclosed to the court...." *United States v. Gianakakis*, 671 F.Supp. 64, 72 (D.Me.1987) (emphasis in original); *cf. United States v. Johnson*, 711 F.Supp. 506, 509 (D.Minn. 1989) (in which the defendant misunderstood an unwritten cooperation agreement because of "miscommunication between her attorneys"). In the matter at bar, the modest expedient of gaining defendant La-

Tray's signature on a cooperation agreement would most likely have obviated the need for this motion.

To interpret the contested cooperation agreement, this court may properly incorporate the principles of case authority which discusses and interprets plea agreements. *United States v. Johnson*, 861 F.2d 510, 512 (8th Cir.1988). Indeed, cooperation agreements are analogous to plea agreements. *Id.* at 512; *United States v. Brown*, 801 F.2d 352, 354 (8th Cir.1986); *Gianakakis*, 671 F.Supp. at 69. Cooperation agreements and plea agreements are contractual in nature and contract analysis is employed in interpreting these agreements. *Johnson*, 861 F.2d at 512; *Brown*, 801 F.2d at 352; *G.D. Searle & Co. v. Interstate Drug Exchange, Inc.*, 117 F.R.D. 495, 502 n. 4 (E.D.N.Y.1987). However, because a defendant's constitutional rights are directly involved with any cooperation agreement entered into, contract principles will not always control the outcome of a dispute arising out of a cooperation or plea agreement. *Staten v. Neal*, 880 F.2d 962, 965 (7th Cir.1989) (plea agreement); *Cooper v. United States*, 594 F.2d 12, 16–20 (4th Cir.1979) (plea agreement).

In the case at bar—to use contract jargon—the court is unable to find a complete meeting of the minds. On the one hand, there is no dispute that the government and the defendant entered into a cooperation agreement. On the other hand, there is a dispute over the terms of that agreement. The defendant contends that, under the agreement, in return for his statement he received a promise that he would not be prosecuted on any gun related charges. The government's position is that the agreement only affected charges contemplated in the Eastern District of Virginia.

The failure to find a meeting of the minds does not end the inquiry. *See, e.g., United States v. Laskow*, 688 F.Supp. 851 (E.D.N.Y.), *aff'd without dec'n*, 867 F.2d 1425 (2d Cir.1988); *United States v. Johnson*, 711 F.Supp. 506 (D.Minn.1989); *United States v. Gianakakis*, 671 F.Supp. 64 (D.Me.1987). For in full keeping with the contract-related analysis, promissory estoppel analysis is also appropriate when untangling cooperation or plea agreement disputes. *See Cooper*, 594 F.2d at 16. As a general rule, for promissory estoppel to attach to a given situation, there must be reasonable and detrimental reliance upon a clear promise. *See R.G. Group v. Horn & Hardart Co.*, 751 F.2d 69, 78 (2d Cir.1984) (New York law). With respect to the case at bar, there cannot be any dispute that the defendant acted in detrimental reliance upon a promise made by the government. Nonetheless, left to be determined is the content of the promise relied upon by the defendant and whether his reliance was reasonable.

Initially, this court finds that the defendant was aware that armed robbery charges were pending against him in this district. In light of the recording of his initial appearance before Magistrate Smith, his adamant denial that he was not informed of the pending armed robbery charge is not credible. However, the defendant's position is not wholly undermined by this adverse finding. He still may have reasonably relied upon a promise that his cooperation with authorities in the Eastern District of Virginia would vitiate the armed robbery charges pending in this district. For the following reasons, the court declines to find for the defendant on this issue.

First, the government presented evidence which supported its position on this matter. While the court is not willing to hold that the letter from Seidel to Tripp *is* the agreement, that letter is probative of the agreement reached. It expressly refers to four crimes for which LaTray would not be charged. The letter does not state that LaTray would not be charged with armed robbery. In addition, in compensation for LaTray's cooperation, Seidel stated "the United States Attorney's Office for the Eastern District of Virginia will not prosecute [LaTray]...." Seidel did not promise, irrespective of any potential charges, that the United States Attorney for the Northern District of New York would not prosecute the defendant. Furthermore, Agent Cross testified that there was no promise

that LaTray's statements would not be used against him in a prosecution in this district.

Second, defendant LaTray's position was not believable. He was not a credible witness. The court observed him to be evasive, aloof, and argumentative when he testified. As already noted, one portion of his testimony has been directly refuted. Furthermore, the defendant produced no evidence that his former attorney, Tripp, objected to Seidel's formulation of the cooperation agreement. In the court's mind, this failure likewise undermines the defendant's position.

■ Finally, the court turns to an issue which is dispositive, the issue of who bears the burden of proving the terms of the cooperation agreement, or the terms of the promise and the reasonableness of La-Tray's reliance. If there were no dispute regarding the terms of the agreement and if the government were contending that the defendant breached the terms of the agreement, then the government would bear the burden of proving the breach. *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). This is a different dispute. The defendant claims that the United States Attorney's Office in one district through a cooperation agreement or promise has foreclosed the prosecution of federal charges by the United States Attorney's Office in another district. It is this court's determination that the defendant bears the burden of proof on this issue.

The Second Circuit has determined that one United States Attorney's Office cannot bind another to a plea agreement "unless *it affirmatively appears* that the agreement contemplates a broader restriction" than the forbearance of prosecution in the district in which the agreement was entered. *United States v. Annabi,* 771 F.2d 670, 672 (2d Cir.1985) (per curiam) (emphasis added). While the Second Circuit has refrained from requiring a defendant to show that a broad restriction on prosecution was reduced to an express statement, *United States v. Russo,* 801 F.2d 624, 626 (2d

Cir.1986), an affirmative showing is nonetheless required. *Laskow,* 688 F.Supp. at 853–54. This court interprets the phrase "affirmatively appears" to indicate that the defendant to prevail must present a showing that a preponderance of the evidence favors his position. Given the defendant's lack of credibility and given the evidence contrary to his position, this court holds that he has not sustained his burden of showing that the promise he relied upon in the Eastern District of Virginia foreclosed the prosecution of armed robbery charges in this district.

■ In placing the burden of proof on the defendant, the court is well-aware that it is has placed the burden on the defendant in an area involving his constitutional rights, not the least of which is his right against self-incrimination. When questions arise in the constitutional arena of criminal procedure, the government frequently bears the burden of proof. *See Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 532–33, 93 L.Ed.2d 473 (1986). Despite this general rule, the court is of the opinion that the defendant's right to litigate the content of the cooperation agreement—or the promises he relied upon—has been sufficiently protected in the case at bar. The defendant was given a full evidentiary hearing in which he was able to contest the reach of the promises made in Virginia. In this instance, the hearing in conjunction with this court's determination provides a "requisite safeguard" of the defendant's rights. *Calabrese,* 645 F.2d at 1390.

For the foregoing reasons, the defendant's motion to dismiss the armed robbery charges is denied. Since the defendant did not ask to suppress the statement he gave to Agent Cross, the court will not address the propriety *vel non* of suppressing that statement under the circumstances.

### SUMMARY

The court denies defendant DeMarc's motion to suppress the statements he gave before he signed the advice of rights form. Defendant LaTray's motion to suppress the statements he gave after his arrest and the

evidence seized as a result of his arrest is denied. Likewise, the court denies La-Tray's motion to construe the promises made by the government in the Eastern District of Virginia to require dismissal of the armed robbery charges.

As all counsel are aware, this case has been transferred to Chief Judge Neal P. McCurn for trial.

It is So Ordered.