## CIRCUIT COURT OF THE CITY OF PORTSMOUTH

Commonwealth of Virginia

     v.

Myra L. Stewart

October 22, 2004

Case No. 04-1409

BY JUDGE MARK S. DAVIS

     This matter is before the Court on the Commonwealth's motion for *nolle prosequi* of the indictment in this case. The charges in this case were certified to the Grand Jury from the General District Court on May 18, 2004. The defendant was indicted by the Grand Jury on June 3, 2004, for conspiracy to commit a felony, Va. Code § 18.2-22, possession of heroin with intent to distribute, Va. Code § 18.2-248, possession of cocaine with intent to distribute, Va. Code § 18.2-248, and possession of a firearm while simultaneously possessing with the intent to distribute narcotics, Va. Code § 18.2-308.4. The Commonwealth's motion for *nolle prosequi* of the indictment was made orally on September 16, 2004, when the matter was before the Court for trial. On objection of the defendant to such motion, the Court scheduled a hearing for October 14, 2004, for further argument and the potential presentation of evidence. The parties appeared on October 14, 2004, for argument and presentation of evidence. The matter is now ripe for decision.

     A more detailed factual and procedural background of this motion, discussion of the issues, and conclusion are set forth below.

*I. Factual and Procedural Background*

The trial of the case was originally set for July 22, 2004, but was continued to August 16, 2004, on a concurrent motion of the prosecution and the defense. On August 16, 2004, the case was again continued for trial to September 16, 2004. When the case was called for trial on September 16, 2004, the Commonwealth moved for *nolle prosequi* as to all counts of the indictment, stating that it anticipated an indictment by the United States charging crimes arising out of the same facts underlying this indictment. The defendant objected to the Commonwealth's motion for *nolle prosequi*, stating that the Commonwealth had orally agreed to prosecute the defendant in state court, rather than federal court, if she would cooperate with their investigation. This Court has previously ruled that, based upon its review of the Virginia appellate decisions addressing the granting or denial of a *nolle prosequi* motion, the focus of a court in determining whether there is "good cause" for such motion is a determination of whether there is any bad faith on the part of the Commonwealth. This Court had also previously held that a decision by the Commonwealth to *nolle prosequi* a case in favor of prosecution by the United States does not constitute bad faith,[1] but the Court has never decided the question of whether the Commonwealth's motion for *nolle prosequi* in favor of prosecution by the United States should be denied if it violated a cooperation agreement. The defendant contended that she had in fact cooperated with law enforcement authorities and the Commonwealth should not be permitted to *nolle prosequi* the case. The defendant further contended that, for these reasons, there was no "good cause," as required by Virginia Code § 19.2-265.3, for such *nolle prosequi*.

The question presented requires the Court to determine whether there was in fact any cooperation agreement, and if so, whether it was breached and what effect that should have on the Commonwealth's motion for *nolle*

---

[1] Va Code § 19.2-294 provides that "if the same act be a violation of both a state and a federal statute, a prosecution under the federal statute shall be a bar to a prosecution under the state statute." That statute also provides that "[f]or purposes of this section, a prosecution under a federal statute shall be deemed to be commenced once jeopardy has attached." This latter section of the statute was amended in 2003, substituting "commenced once jeopardy has attached" for "commenced with the return of an indictment by a grand jury or the filing of an information by a United States attorney." Therefore, the policy of the Commonwealth as expressed in this statute is consistent with this Court's holding that a decision by the Commonwealth to *nolle prosequi* a case in favor of prosecution by the United States does not constitute bad faith.

*prosequi.* The case was continued to October 14, 2004, for such hearing, at which time the parties appeared before the Court.

The facts stated here are based upon statements made at both the September 16, 2004, and October 14, 2004, hearings by counsel for the parties. The facts are also drawn from the statement of facts contained in the "Brief in Support [of] the Commonwealth's Motion to Nolle Pros the Indictment" filed on October 7, 2004, in this matter, pursuant to the statement of the Assistant Commonwealth's Attorney at the October 14, 2004, hearing indicating that he had knowledge of and affirmed those facts.

## A. *Defense Recollection*

Defendant's counsel, Sterling H. Weaver, Esq., stated that he became involved in this matter while it was pending in the Portsmouth General District Court, having first heard of the case from the news media and the defendant having later retained his representation. Mr. Weaver stated that the case involved allegations that the defendant was found alone at her home when a search warrant was executed; that substantial amounts of alleged cocaine and heroin were present in the home at that time; and that her boyfriend Melvin Crawley was the party responsible for the presence of the suspected cocaine and heroin. Mr. Weaver stated that when he tried to obtain a copy of the certificate of analysis for the suspected narcotics, he discovered it was not in the General District Court file. Therefore, prior to the preliminary hearing, he advised the Assistant Commonwealth's Attorney/Special Assistant United States Attorney, Andrew M. Robbins, Esq., of the absence of the certificate and indicated he wanted a bond for his client. Mr. Weaver stated that, at that time, Mr. Robbins asked if the defendant would be interested in cooperating against her boyfriend, Melvin Crawley, who was being prosecuted in the U.S. District Court in Norfolk, Virginia. Mr. Weaver stated that he spoke to the defendant, who indicated an interest in cooperating. Mr. Weaver then told Mr. Robbins the defendant was willing to cooperate by testifying against Mr. Crawley and that she would waive her preliminary hearing in exchange for an agreement on reasonable bond (which was agreed to as $20,000.00 with surety) and an agreement that the case would remain in state court. Mr. Robbins agrees that these discussions took place and that Mr. Weaver's recitation is in substance consistent with Mr. Robbins' recollection with the notable exception of the term relating to the case remaining in state court. Mr. Robbins stated that he may have made some statement to the effect that he would try to keep the case in state court, but not a promise to that effect.

According to Mr. Weaver, he spoke to the defendant and she agreed to the terms he described above. He returned to speak to Mr. Robbins, and, while they were still outside the General District Court, Mr. Robbins stated that the defendant should call Detective Gavin. After that, the attorneys went into the General District Court and the defendant waived the preliminary hearing and bond was set at $20,000.00 with surety. Mr. Weaver stated that he then filled out a Court Information Form that he utilizes for his internal office procedures and noted on the form that the preliminary hearing was waived pursuant to agreement.

Mr. Weaver said that he later directed the defendant to call Detective Gavin, but that there was difficulty in making the arrangements. A meeting was finally arranged and Mr. Weaver met with the defendant and Detective Gavin and Detective Gavin stated at the beginning of the interview that the defendant was there pursuant to an agreement to testify and that the information she gave would not be used against her in any prosecution assuming she cooperated. Mr. Weaver stated that the interview was terminated because he did not believe that his client was being completely cooperative. Mr. Weaver said that, subsequently, he received a telephone call from Mr. Robbins and Laura Tayman, Esq., a Supervising Assistant United States Attorney, stating that Detective Gavin had contacted them to say that the defendant had not cooperated and that she would be prosecuted in the United States District Court if she was not fully cooperative. Mr. Weaver stated that there was no discussion of the defendant's pleading guilty in the Virginia court, contrary to the recollection of Mr. Robbins. Mr. Weaver indicated that, after this conversation, Detective Gavin called him with his number so that the defendant could call Detective Gavin. Ultimately the defendant spoke to Detective Gavin, and Detective Gavin later reported to Mr. Weaver that the defendant had been cooperative during that meeting.[2]

Mr. Weaver stated that, while all of this was going on, he pressed forward with trial preparations, meeting with Mr. Robbins on June 2, 2004, to agree on discovery dates and an evidence viewing date. When Mr. Weaver appeared at the police department to view the evidence, he was told the alleged cocaine and heroin were not there but were being housed elsewhere in connection with the United States' prosecution of Mr. Crawley. Mr. Weaver said that he continued to interview witnesses and prepare his discovery. When the case came up for trial the first time, Mr. Weaver said that it was continued because Mr. Crawley had not yet been tried by the United States. Mr. Weaver

---

[2] Neither of the parties obtained the presence of Detective Gavin at the October 14, 2004, hearing, nor was any evidence presented other than the recitations by counsel.

stated that, when the case came up for trial, the second time, the same thing occurred.

On September 16, 2004, when the case was scheduled for trial, Mr. Weaver stated that he knew Mr. Crawley had already entered a guilty plea in the United States District Court. According to Mr. Weaver, on the morning of September 16, 2004, Mr. Robbins approached him and said that if the defendant would plead guilty to all the other charges, the Commonwealth would drop the gun charge. Mr. Weaver stated that, when he asked Mr. Robbins how the Commonwealth intended to prove the other charges,[3] Mr. Robbins responded that they had an agreement that the defendant would plead guilty in the Portsmouth Circuit Court and Mr. Weaver responded that the agreement was only that that the matter would be prosecuted exclusively in the Portsmouth Circuit Court. Mr. Weaver indicates that Mr. Robbins then left to speak with law enforcement officers and returned saying he needed to speak to Ms. Tayman and the Commonwealth's Attorney. Mr. Weaver stated that, when Mr. Robbins returned, he said that the agreement provided that the defendant was to plead guilty to all the charges and that is what he expected to take place, in effect withdrawing his offer to drop the gun charge. At that point, the Court called the case.

## B. *Commonwealth's Recollection*

The Commonwealth, through representations of Mr. Robbins, stated at the October 14, 2004, hearing and/or in its Brief in Support that, while the cases of co-defendants Myra L. Stewart and Melvin K. Crawley were pending in the Portsmouth General District Court, the facts of this matter were presented to the U.S. Attorney's office in Norfolk for possible prosecution by the United States. The United States Attorney was considering whether to prosecute both Stewart and Crawley, or just Crawley, whom the United States viewed as the primary actor in the alleged conspiracy.

According to Mr. Robbins, he then discussed the case with Ms. Tayman. After the conversation, Mr. Robbins and Ms. Tayman decided that the defendant's testimony could be helpful in the United States' prosecution of Mr. Crawley. Mr. Robbins stated that he and Ms. Tayman then spoke with Mr. Weaver on the telephone. Mr. Robbins stated that he and Ms. Tayman were

---

[3] Mr. Weaver indicated at the September 16, 2004, hearing that the certificate of analysis for the narcotics was not in the circuit court file. He also stated at the October 14, 2004, hearing that the narcotics were never produced to him for inspection pursuant to the discovery orders entered by the court on June 21, 2004.

together on a speakerphone during this conversation, which was initiated from Ms. Tayman's office. Mr. Robbins stated that, initially, he told Mr. Weaver that the U.S. Attorney's office planned to "adopt" the case for prosecution and was seeking Ms. Stewart's cooperation. Mr. Robbins also said that he stated that, based upon the large amount of crack cocaine found in the residence at issue, the presence of firearms, and the statements given by Ms. Stewart on the night of her arrest, Ms. Stewart faced significant potential time incarcerated pursuant to the Federal Sentencing Guidelines, while Virginia's voluntary sentencing guidelines might provide a far more favorable outcome for his client, particularly if a Virginia sentencing judge were told of Ms. Stewart's cooperation.

Mr. Robbins stated that Mr. Weaver responded that he could not recommend that Ms. Stewart cooperate unless he knew what the sentencing recommendations would be in the Virginia court, and Ms. Tayman then stated that there would be no agreement as to sentencing recommendations in the Virginia circuit court, though the plea of guilty in the Virginia Circuit Court would likely result in a much lighter sentence than in the United States District Court. According to Mr. Robbins, Mr. Weaver then stated he would respond after speaking with his client.

Mr. Robbins stated that Mr. Weaver spoke to him a few days later and said that Ms. Stewart did wish to cooperate and that he would make her available to investigators at a mutually agreed-upon place and time. According to Mr. Robbins, as a result of that conversation, the United States Attorney presented an indictment to a United States grand jury, charging only Mr. Crawley with the federal offenses, and Ms. Stewart was scheduled for an interview with Portsmouth Police Department Detective K. L. Gavin and Mr. Weaver. Mr. Robbins stated that Detective Gavin later reported to the United States Attorney's office that Ms. Stewart had not been forthcoming during the interview, but that another interview was set up after that. Robbins also stated that Detective Gavin reported after the second interview that Ms. Stewart was more cooperative than she had been during the first interview, but that her statements were not fully forthcoming in his estimation. Mr. Robbins did not indicate that he took any punitive action based upon this report from Detective Gavin, apparently content to proceed with what he thought to be the defendant's agreement to plead guilty to the indictment.

Mr. Robbins indicated that, while the case by the United States against Mr. Crawley was pending, this case proceeded, with discovery orders being entered, discovery answers being provided, and a limited evidence review being conducted. The physical evidence was not shown to Mr. Weaver because it was being kept elsewhere for use in the United States' case,

according to Mr. Robbins. He also stated that the chemical analysis of the suspected drugs conducted by the U.S. Drug Enforcement Administration was not filed in this Court's file because it was necessary to be filed in the United States' prosecution of Mr. Crawley.

Mr. Robbins stated that Mr. Crawley pleaded guilty to a federal weapons charge, conspiracy, and drug distribution charges in the United States District Court on September 8, 2004. Mr. Robbins indicated that, before the court appearance on September 16, 2004, he indicated to Mr. Weaver that he would *nolle prosequi* the count of the indictment against Ms. Stewart charging possession of a firearm while possessing with the intent to distribute drugs. Mr. Robbins stated that, in response, Mr. Weaver asked how the Commonwealth planned to prove the charges and Mr. Robbins responded that he was under the impression that the defendant had agreed to plead guilty to the charges in the indictment and that the offer to *nolle prosequi* the gun count was made out of fairness and in consideration of Mr. Weaver's efforts to have his client cooperate. According to Mr. Robbins, Mr. Weaver responded that his understanding of the agreement was that Ms. Stewart's charges would be resolved in the Virginia Circuit Court in consideration of her cooperation against Mr. Crawley, but that there had been no agreement that she would plead guilty to the charges.

Mr. Robbins indicates that the Commonwealth's Attorney, Mr. Mobley, then contacted Ms. Tayman who reported to him that she was also under the impression from the conversation with Mr. Weaver that Ms. Stewart would plead guilty to all of the charges in the pending Virginia prosecution.[4] Mr. Robbins indicated that Ms. Tayman also reported that she considered Ms. Stewart to be in violation of her agreement with the United States Attorney's office if she refused to plead guilty in the Virginia prosecution. Mr. Robbins stated that he then advised Mr. Weaver that the United States Attorney considered Ms. Stewart in violation of her agreement if she refused to plead guilty to the Virginia charges, including the gun count, and that the Commonwealth would move to *nolle prosequi* the Virginia charges and Ms.

---

[4] Mr. Weaver stated at the October 14, 2004, hearing that, while he objected to the Commonwealth's motion for *nolle prosequi*, he never indicated that the defendant was not ready to proceed. Mr. Robbins responded that, if he had waited for the defendant to plead not guilty, as Mr. Weaver indicated she would, then jeopardy would have attached and he could not have moved for the *nolle prosequi*. In view of the conclusion reached here, it is not necessary for this Court to address this contention.

Stewart would be prosecuted by the United States. According to Robbins, Mr. Weaver then stated that Ms. Stewart did not intend to plead guilty.

When the case was called on September 16, 2004, Mr. Robbins moved to *nolle prosequi* the indictment and Mr. Weaver objected, as noted above. Mr. Weaver argued that there was an agreement, that Ms. Stewart had complied with the agreement, that the Commonwealth's motion was a violation of the agreement, and "good cause" for the *nolle prosequi* was therefore absent. The Commonwealth argued that Ms. Stewart was the one who had breached the agreement and her breach constituted "good cause" for the *nolle prosequi*.

During the October 14, 2004, hearing, the Commonwealth indicated that a United States grand jury indicted Ms. Stewart on September 23, 2004, with charges equivalent to those pending under this indictment.

## II. Discussion

The Court first addresses the law applicable to the Commonwealth's motion for *nolle prosequi* and the implications of the Separation of Powers Doctrine on such law. The Court next addresses the law applicable to the agreement alleged by the parties and reaches conclusions as to which law applies and how the law applicable to a cooperation agreement differs from that applicable to a plea agreement. Following those discussions, the Court reviews the law applicable to the contractual analysis required in evaluating an alleged cooperation agreement and makes findings of fact regarding that analysis.

### A. Nolle Prosequi Considerations

Virginia Code § 19.2-265.3, enacted in 1979, provides that "*nolle prosequi* shall be entered only in the discretion of the Court, upon motion of the Commonwealth with good cause therefore shown." Such "a *nolle prosequi* is a discontinuance which discharges the accused from liability on the indictment to which the *nolle prosequi* is entered." *Miller v. Commonwealth,* 217 Va. 929, 935, 234 S.E.2d 296, 273 (1977), *cert. denied,* 434 U.S. 1016, 98 S. Ct. 735, 54 L. Ed. 2d 762 (1978). When the offense is a felony, as here, a *nolle prosequi* "lays to rest that indictment and the underlying warrant without disposition, as though they never existed." *Burfoot v. Commonwealth,* 23 Va. App. 38, 44, 473 S.E.2d 724, 727 (1996).

Under the common law, a prosecutor had unlimited discretion to enter a *nolle prosequi* without any court involvement. *Ohio v. Mucci,* 150 Ohio App.

3d 493, 500, 782 N.E.2d 133, 139 (2002), *see United States v. N.V. Nederlandsche Combinatie vor Chemische Industrie*, 75 F.R.D. 473, 475 (S.D. N.Y. 1977). However, legislators and courts of various jurisdictions, including the federal government, have acted to take this unlimited post-indictment discretion away from the prosecution. *Mucci*, 150 Ohio App. 3d at 500, 782 N.E.2d at 139, *see* 1944 Advisory Committee Notes to Fed. Crim. R. 48(a). Therefore, where a statute or rule of court limits a prosecutor's unlimited post-indictment discretion to enter a *nolle prosequi*, it acts as a check and balance to the discretion of a prosecutor to dismiss an indictment. *Mucci*, 150 Ohio App. 3d at 500, 782 N.E.2d at 139. Such rules and statutes have been promulgated and enacted in order to curb abuses of executive prerogative and to protect a defendant from harassment by government through charging, dismissing, and then re-charging without placing a defendant in jeopardy. *Id.*, *Woodring v. United States*, 311 F.2d 417, 423 (8th Cir. 1963), *cert. denied*, 373 U.S. 913, 83 S. Ct. 1304, 10 L. Ed. 2d 414 (1963). However, the power to require "good cause" is generally exercised with great caution by Courts.

There is little discussion in the Virginia cases regarding the standard for determining whether "good cause" exists under the statute. In *Cantrell v. Commonwealth*, 7 Va. App. 269, 277-78, 373 S.E.2d 328, 331-32 (1990), the defendant moved to dismiss the indictment against him with prejudice because it was purportedly tainted by prosecutorial misconduct. Rather than proceed to trial on a possible defective indictment and to cure any possible error, the Commonwealth moved to *nolle prosequi* the indictment and the trial court granted the motion. *Id.* At that time, no jury had been empaneled and sworn. In addressing the defendant's contention that jeopardy attached, the court observed that the trial court stated it was granting the motion out of concern regarding the possible taint on the indictment and it did not want to waste judicial resources by trying a case that might be reversed based upon the taint. *Id.* The Court of Appeals concluded that the "trial judge's decision to grant the *nolle prosequi* was for good cause shown and within his discretion." *Id.* at 280, 373 S.E.2d at 333. The Court went on to clarify that the Commonwealth was not required to show "manifest necessity" before the motion could be granted, observing that "the Commonwealth's attorney was merely required to show good cause, and the trial court, in its discretion, could grant the motion." *Id.*

The Virginia Court of Appeals also addressed the application of the "good cause" standard in *Battle v. Commonwealth*, 12 Va. App. 624, 630-32, 406 S.E.2d 195, 198-99 (1991), where the defendant argued that the trial court erred in refusing to dismiss the indictments after granting the

Commonwealth's motion for *nolle prosequi*. The Court observed that a defendant's refusal to withdraw an objection to the admissibility of excluded evidence does not constitute good cause and *nolle prosequi* is no remedy for the Commonwealth's failure to properly prepare its case or to timely respond to discovery. *Id*. at 631, n. 2, 406 S.E.2d at 198, n. 2.

Subsequently, the Virginia Supreme Court addressed the "good cause" required for *nolle prosequi* in *Harris v. Commonwealth*, 258 Va. 576, 583-85, 520 S.E.2d 825, 829-30 (1999). In that case, the Commonwealth sought continuance of a trial, based in part on lack of preparation by the attorney and partly on factors beyond his control. *Id*. The motion for a continuance was denied, and the Commonwealth moved to *nolle prosequi* the case, which motion was granted. The defendant challenged the decision, and the Court observed that the "express language of the statute commits a finding of good cause to the discretion of the trial court." *Id*. Noting that the basis for the motion was, in part, the failure of the Commonwealth to adequately prepare its case, the Court stated that, where such lack of preparation was coupled with factors beyond the Commonwealth's control, it "does not demonstrate *bad faith* on the Commonwealth's part. Nor does the decision of the Commonwealth to seek a *nolle prosequi* rise to the level of *oppressive tactics* amounting to prosecutorial misconduct in this instance." (emphasis added). *Id*. at 584, 520 S.E.2d at 830, *see United States v. Wallace*, 848 F.2d 1464, 1468 (9th Cir. 1988) (recognizing that fundamental consideration in assessing the propriety of a prosecutor's motion to dismiss is whether the motion is made in good faith).

These Virginia cases make clear that the discretion of the trial court in considering a motion for *nolle prosequi* is not unbridled. Based upon this Court's review of the Virginia appellate cases addressing this issue, the terms "bad faith" and "oppressive tactics" used in *Harris* provide the best summary of situations in which there was no "good cause." However, in determining whether there is such bad faith or oppressive tactics sufficient to justify denying the Commonwealth's motion for *nolle prosequi*, the trial court has broad discretion in making its findings regarding "good cause."

In striking the proper balance between the prosecution's discretion to *nolle prosequi* an indictment and the Court's power to prevent abuses of executive prerogative, courts have recognized that the prosecution is first and presumptively the best judge of where the public interest lies, and the trial court should not merely substitute its judgment for that of the prosecution. *United States v. Hamm*, 638 F.2d 823, 828 (5th Cir. 1981). Some courts have sought to further define the appropriate standard for making such decisions by recognizing that a court should defer to the prosecution's request for *nolle*

*prosequi* unless the prosecution is clearly wrong. *Id., see Wallace*, 848 F.2d at 1468 (recognizing court's discretion to deny dismissal if motion is prompted by considerations "clearly contrary" to public interest).

Striking the proper balance in this area of the law requires consideration of the Separation of Powers Doctrine. At the October 14, 2004, hearing the defendant argued that the Commonwealth's motion implicates Constitutional due process considerations. Therefore, the potential effect of such a motion upon a defendant's due process rights suggests that review of the constitutional considerations might be helpful in defining the proper scope of the prosecution's discretion.[5] In *United States v. Cowan*, 524 F.2d 504, 507-13 (5th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S. Ct. 2168, 48 L. Ed. 2d 795 (1976), a panel of the Fifth Circuit Court of Appeals, consisting of Judge John Minor Wisdom, closely examined a prosecution claim that the Separation of Powers Doctrine provided the prosecution with absolute power to dismiss proceedings.[6] The prosecution in that case had refused to prosecute, and the trial judge appointed a special prosecutor to proceed with the case. In denying the prosecution's assertion, the *Cowan* court meticulously reviewed the considerations implicated by the Separation of Powers Doctrine and concluded:

> The Executive remains the absolute judge of whether a prosecution should be initiated and the *first and presumptively the best judge* of whether a pending prosecution should be terminated. The exercise of its discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless *clearly contrary to manifest public interest*. In this way, the essential function of each branch is synchronized to achieve a balance that serves both practical and constitutional values.

*Id.* at 513 (emphasis added).

While the *Cowan* opinion is not binding on this Court, its sound reasoning and the fact that the United States Supreme Court has cited it with approval suggest that it provides the proper construct for evaluation of the

---

[5] U.S. Const., amend. XIV, § 1, provides that no state shall "deprive any person of life, liberty, or property, without due process of law. . . ."

[6] In *Rinaldi v. United States*, 434 U.S. 22, 29, 98 S. Ct. 81, 85, 54 L. Ed. 2d 207 (1977), the Supreme Court of the United States, citing *Cowan*, held that the district court could not deny leave to dismiss an indictment unless "the Government's decision to terminate [the] prosecution clearly disserved the public interest."

question before this Court. Therefore, this Court adopts the well-reasoned conclusion quoted above. Accordingly, in reviewing the Commonwealth's decision to move for *nolle prosequi* of the indictment, this Court will not interfere with the Commonwealth's decision to seek *nolle prosequi* unless the Court determines that the exercise of such discretion is clearly contrary to manifest public interest. In determining whether a prosecutor's exercise of its discretion to terminate prosecution of a case is clearly contrary to manifest public interest, the Virginia appellate decisions cited above have found that, when the facts demonstrate bad faith or oppressive tactics, "good cause" does not exist.

The Court now turns its attention to the assertions of both parties that there was an agreement and that the other party is in violation of such agreement.

## B. *Cooperation Agreement*

Va. Sup. Ct. R. 3A:8 provides that "[i]f a plea agreement has been reached by the parties, it shall, in every felony case, be reduced to writing, signed by the attorney for the Commonwealth, the defendant, and, in every case, his attorney, if any, and be presented to the court." The Commonwealth argued at the September 16, 2004, hearing that the conversations described above do not rise to the level of a proposed plea agreement *consistent with* the definitions in Va. Sup. Ct. R. 3A:8, and the defendant conceded that point at the same hearing.[7] At the October 14, 2004, hearing, the defense asserted that the alleged agreement at issue is in fact a plea agreement, even though it did not meet any of the definitions of a plea agreement contained in Va. Sup. Ct. R. 3A:8, and that it was not required to be in writing.

The Commonwealth contends that the Court should evaluate the alleged agreement in the context of a "cooperation agreement," and states that the Court has two options before it: (1) grant the motion for *nolle prosequi*, or (2) deny the motion and dismiss the charges (presumably because the

---

[7] Va. Sup. Ct. R. 3A:8 describes the types of plea agreements that are contemplated. Specifically, it provides that upon entry of a plea of guilty or a plea of *nolo contendere*, the parties may agree to (1) move for *nolle prosequi* or dismissal of other charges, (2) make a recommendation, or agree not to oppose the defendant's request for a particular sentence, with the understanding that such recommendation or request shall not be binding on the court, or (3) agree that a specific sentence is the appropriate disposition of the case. Clearly, the parties have properly agreed that the alleged agreement at issue here is not covered by this rule.

Commonwealth would decide not to proceed with them at that point).[8] The Commonwealth also suggests that the agreement was more of a non-prosecution agreement than an immunity agreement. For purposes of this discussion, the Court will use the term "cooperation agreement."[9]

As the Virginia Court of Appeals recognized in *Commonwealth v. Sluss*, 14 Va. App. 601, 604, 419 S.E.2d 263, 265 (1992), cooperation agreements contravene no constitutional or statutory provisions. *See United States v. Aleman*, 286 F.3d 86, 89 (2d Cir. 2002). Furthermore, such agreements are contractual in nature and are subject to principles of contract law. *Sluss*, 14 Va. App. at 604, 419 S.E.2d at 265. Cooperation agreements, "which are analogous to plea agreements, must be attended by constitutional safeguards to ensure [that] a defendant receives the performance he is due." *Id.* (*citing Santobello v. New York*, 404 U.S. 257, 262 (1971)). Unlike commercial contracts, cooperation agreements are subject to due process safeguards requiring that the government strictly adhere to the terms of its agreement. *Sluss*, 14 Va. App. at 604, 419 S.E.2d at 265. Therefore, "to allow the government to receive the benefit of its bargain without providing the reciprocal benefit contracted for by the defendant would do more than violate

---

[8] In *United States v. Cowan*, 524 F.2d 504, 507 (5th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S. Ct. 2168, 48 L. Ed. 2d 795 (1976), the trial court appointed a special prosecutor after it denied the prosecutor's motion to dismiss and after the prosecutor filed a notice of intention not to prosecute. Without addressing the trial court's authority to make such appointment, the court of appeals reversed the trial court's denial of the motion to dismiss, finding that the considerations on which the district court relied in denying such motion were insufficient to overcome the presumption of the government≐s good faith in deciding not to prosecute the matter. *See* Va. Code § 19.2-155 (providing for appointment of special attorneys for the Commonwealth).

[9] The Court observes, as have other courts, the difficulty of the present decision because of the fact that there is no written agreement. In *United States v. LaTray*, 739 F. Supp. 88, 94 (N.D. N.Y. 1990), *aff'd without opinion by* 935 F.2d 1277 (2d Cir. 1991) (quoting from *United States v. Barnes*, 604 F.2d 121, 150 (2d Cir. 1979)), the court observed that "[t]he practice of reducing [cooperation] agreements to writing has grown out of situations which have frequently arisen in which there have been disputes as to the terms of oral understandings on the subject. The writing presents the opportunity for both parties to know the exact nature of their commitments." Therefore, the advice of the court in *United States v. Gianakakis*, 671 F. Supp. 506, 509 (D. Minn. 1989), that "[a]ll counsel are well advised to make sure that . . . cooperation agreements are *clearly* understood by all parties, *carefully* memorialized" seems appropriate here.

the private contractual rights of the parties — it would offend all notions of fairness in the related criminal proceedings, which are protected by constitutional due process." *Id.*

As the *Sluss* court recognized, specific performance of an agreement not to prosecute is appropriate in certain circumstances. In *United States v. Johnson*, 861 F.2d 510, 512 (1988), a case cited by the court in *Sluss*, the court held that specific performance of an agreement not to prosecute is appropriate unless: (1) the government made no firm promise of immunity, *United States v. Calimano*, 576 F.2d 637, 640 (5th Cir. 1978); *United States v. Weiss*, 599 F.2d 730, 735 (5th Cir. 1979), (2) the defendant failed to fulfill her part of the bargain, (3) the government's offer of immunity of the defendant's acceptance was based on a mistake in law or fact, (4) the term for which the defendant seeks specific performance was not a term of the contract, (5) the government's decision to seek an indictment was made in good faith, (6) the government's breach resulted in no prejudice to the defendant, or (7) specific enforcement would have an adverse impact on the public.

While several of these factors are conceivably implicated here, the Court need go no further than to address the first. In *Calimano*, 576 F.2d at 640, the defendant was indicted and then filed a motion for specific performance of an alleged plea agreement to dismiss the charges. That court observed that the record revealed a serious dispute between the prosecutor and the defense counsel concerning the existence of an agreement to dismiss the indictment. The prosecutor took the position that he had discussed the possibility with defense counsel of according the defendant some form of leniency, including dismissal of the indictment, but that any benefit flowing to the defendant from the government was conditioned upon the value of the information provided by the defendant. The prosecutor denied that he made an absolute promise to dismiss the charges against appellant. *Id.* The defense counsel, on the other hand, contended that discussions regarding the possible agreement stretched over two separate days and that the agreement reached on the second day was later reaffirmed at the defendant's interview. *Id.* The *Calimano* court observed that "[t]he trial judge was thus essentially faced with two conflicting interpretations of discussions held between opposing counsel. The court discredited the testimony of neither attorney but simply found that the evidence failed to show 'that the Government made a firm promise or commitment to dismiss the indictment'." *Id.*

The *Weiss* court also addressed this requirement that the government make a firm promise. In *Weiss*, 599 F.2d at 735, the defendant agreed to cooperate but was later convicted of various crimes. The defendant appealed his convictions, claiming that the government breached its promise to dismiss

the indictment in exchange for his cooperation. The *Weiss* court reviewed the *Calimano* holding, characterizing the court's holding as a finding that "there was no agreement because there had been no meeting of the minds and the defendant failed to show 'a firm promise or commitment to dismiss the indictment'."[10] *Id.* at 736. Then the *Weiss* court stated that it reached the same conclusion on the similar facts of its case. The trial court had found that there was evidence the defendant was told that there was a possibility he might not be indicted or that he might "walk scot free." *Id.* However, the trial court also found that the defendant was told that only "strike force" attorneys were authorized to enter into agreements. Nonetheless, the defendant contended that, after these statements were made, he was told by one of the prosecutors that, if he cooperated, he would go free. The trial court found that in the face of this conflicting testimony regarding the discussions, there was no "firm promise or commitment" to the defendant. *Id.* at 736.

In *Johnson*, the case cited by the Virginia Court of Appeals in *Sluss* and where the court listed the factors to consider in deciding whether specific performance of a cooperation agreement was warranted, the U.S. Court of Appeals for the Eighth Circuit remanded the case to the trial court to determine whether an agreement existed and how to proceed in light of that determination. *Johnson*, 861 F.2d at 513. On remand, the trial court conducted such an evidentiary hearing, finding that the defendant retained an attorney and the attorney advised her that the "evidence against [the defendant] presented a good case for the prosecution and that it was in her interest to have the charges brought in state court rather than federal court." *United States v. Johnson*, 711 F. Supp. 506, 508 (D. Minn. 1989) (hereafter referred to as *Johnson II*). The defendant advised her attorney that she wished to cooperate, and her attorney then spoke to the prosecutor. The trial court found that "the agreement between the [prosecutor and the defendant's attorney] was that, if [the defendant] gave full information of her drug-related activities candidly and truthfully, then [the prosecutor] would consider referring the prosecution to state court." *Id.* at 508. The defendant was to initiate the contact with police officers to show her good faith and interest in cooperating. *Id.* After the defendant's cooperation, the prosecutor would make the decision whether to seek a federal indictment or refer the case to the state court, and the prosecutor would rely upon the police officer's assessment of the defendant's candor. The court found that there was no "definite" promise by the prosecutor that the

---

[10] This Court agrees that a finding that there was no firm promise or commitment is the same as finding there was no agreement because there was no meeting of the minds.

defendant's case would be referred to state court if she cooperated, in essence finding there was no meeting of the minds. *Id.*

After these initial conversations between the prosecutor and the defense counsel in *Johnson II*, the defense attorney advised defendant that he did not handle cooperation agreements and suggested another attorney whom defendant subsequently retained (attorney # 2). *Id.* Attorney # 2 conferred with the original defense attorney about the agreement and "understood from [the original defense attorney] that if [defendant] cooperated with the police by meeting with them and answering their questions, then the criminal matter would be referred to state court." *Id.* The defendant understood from attorney # 2 that the agreement contained this definite promise. The trial court found "that something was inadvertently lost in translation or interpretation." *Id.* Attorney # 2 later contacted the prosecutor regarding defendant's cooperation and the prosecutor repeated the same terms, that defendant had to initiate contact with the officers, and that, if she testified fully, candidly, and truthfully, he would consider referring prosecution to a state court, stated to the original defense attorney. Attorney # 2 again called the prosecutor at a later date and asked if the opportunity to cooperate remained open and was told any meeting had to take place that day since he was going to the grand jury the following day. The defendant then met alone with the officers (without her attorney) and the officers made no promises to her. After she spoke with them for an hour, the meeting ended. The officers testified that getting information from the defendant during that meeting was like "pulling teeth," volunteering very little and only providing brief answers to pointed questions. The officers advised the defendant that they did not believe she was cooperating fully. Immediately after the meeting, the defendant returned to attorney # 2's office and told him what happened, specifically stating that the officer did not say they were going to refer the case to the state court. Attorney # 2 did not inquire of the officers or prosecutor how the meeting went, and the prosecutor presented an indictment to the federal grand jury the following day based on the perceived lack of candor of the defendant during the interview. *Id.*

The trial court in *Johnson II* concluded that there never was a "definite" agreement to refer prosecution to the state court such that defendant was entitled to specific performance. *Id.* The trial court concluded that the meeting between the original defense attorney and the prosecutor did not result in an agreement, nor did the subsequent discussions between defense attorney # 2 and the prosecutor. *Id.*

Similar facts were addressed in a case with connections to Virginia. In *United States v. LaTray*, 739 F. Supp. 88, 95 (N.D. N.Y. 1990), *aff'd without*

*opinion by* 935 F.2d 1277 (2d Cir. 1991), defendants were arrested in Virginia after robbing an armored car company in New York. One of the defendants agreed to tell the government where the money was hidden for favorable treatment. The prosecutor sent the defendant's Virginia attorney a letter stating he would not prosecute the defendant in Virginia with certain offenses, not including armed robbery. The defendant was subsequently returned to New York and charged with armed robbery there, and he moved to dismiss the case claiming there was an agreement precluding such prosecution. *Id.* at 93-94. The defendant claimed he cooperated but was told by his attorney he would not be prosecuted with any charges relating to the gun. However, a letter from the Virginia prosecutor to defense counsel contained no such promise. The trial court concluded that it was unable to find a meeting of the minds because of the factual issues. The court also concluded that, while the government normally bears the burden of providing the terms of a cooperation agreement when it is asserting the defendant breached the agreement, as when it wishes to use testimony obtained from a defendant as a result of such cooperation, under the facts of *LaTray*, the defendant bore the burden of proving the terms of the cooperation agreement by a preponderance of the evidence because he was claiming that the cooperation agreement from another jurisdiction foreclosed prosecution in that jurisdiction. *Id.* at 96.

With these general observations in mind from cases similar to the facts here, the Court now turns its attention to the Commonwealth's contentions regarding the law applicable to these facts. The Commonwealth contends that the Virginia Supreme Court's decision in *Commonwealth v. Sandy*, 257 Va. 87, 509 S.E.2d 492 (1999), addresses the effect of such agreements and controls the outcome in this case. In *Sandy*, the defendant's counsel and the Commonwealth's attorney entered into plea negotiations after the defendant was indicted on thirty-two counts of intentionally and feloniously issuing fraudulent grain receipts. These plea negotiations culminated in the execution of a written agreement, providing: (1) that he would meet with and fully answer questions posed by the Commonwealth and would receive transactional immunity for all acts related to the information he provided, (2) that, if the Commonwealth's attorney was reasonably satisfied the defendant provided full and complete information, then the Commonwealth would move the court to amend seven of the indictments to petty larceny and that she would move the court to *nolle prosequi* or dismiss all of the other indictments, and (3) that the Commonwealth would recommend to the court that the defendant should be fined $500.00 on each of the no more than seven misdemeanor charges for which he was convicted and be sentenced to six

months in jail on each such charge, to run concurrently and be suspended upon payment of the fines. *Id*. at 89, 509 S.E.2d at 492-93.

In *Sandy*, when the Commonwealth refused to comply with the agreement, due to its belief the defendant had not complied with the terms of the agreement, the defendant moved to enforce the agreement. The Commonwealth contended on appeal that there was no enforceable plea agreement with constitutional significance because the trial court had not approved any plea agreement. The defendant responded that, even though there was no plea agreement, he executed a "cooperation agreement" and fully complied with the "so-called cooperation agreement and, hence, is entitled to specific performance of that agreement." *Id*. at 90-91, 509 S.E.2d at 493. The court concluded that there never was a plea agreement because the trial court never approved such agreement. Implicitly recognizing that the proffered agreement was a proposed plea agreement, rather than a cooperation agreement, the Court noted that a plea "bargain" standing alone is without constitutional significance because it is a mere executory agreement "which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest. It is the ensuing guilty plea that implicates the Constitution." *Id*. at 91, 509 S.E.2d at 494. The court concluded that "a commonwealth's attorney may withdraw from a proposed plea agreement at any time before the actual entry of a guilty plea by a defendant or any other change of position by the defendant resulting in prejudice to him because of reliance upon the agreement." *Id*.

While *Sandy* is informative, it involves a plea agreement, not a pure cooperation agreement. The fact that the Virginia Supreme Court nowhere mentions the *Sluss* opinion by the Virginia Court of Appeals further bolsters the conclusion that the court was not addressing a cooperation agreement. The proposed agreement at issue in *Sandy* was clearly in the nature of a proposed plea agreement, since, among other things, it provided for *nolle prosequi* of some charges and a reduction of other charges coupled with a recommendation as to the appropriate sentence "on each of the no more than seven (7) misdemeanor charges for which he is convicted, and be sentenced to six (6) months in jail on each such charge. . . ." Va. Sup. Ct. R. 3A:8(c)(1)(A) provides, in pertinent part, that the attorney for the Commonwealth and the attorney for the defendant may engage in discussions with a view toward reaching agreement that, upon a plea of guilty, some charges will be *nolle prosequi* or that a recommendation as to sentence be made. While the plea agreement language quoted in *Sandy* does not say that the defendant will plead guilty, such a plea is necessary before the Commonwealth can make the recommendation for sentence contained in the agreement. Therefore, while

*Sandy* is informative for this discussion and while the discussion of potential prejudice to a defendant who seeks to comply with a proposed plea agreement applies equally to the discussion of potential prejudice to a defendant who seeks to comply with a proposed cooperation agreement, the facts of *Sandy* are different from those before this Court.

The agreement alleged by both parties is not in the nature of a plea agreement because it does not provide for any of the three options set out in Va. Sup. Ct. R. 3A:8. Defendant's statement, that she understood that, in exchange for cooperating, she would be prosecuted (not plead guilty) in a state court and the Commonwealth's statement that, after the telephone conversation referenced above, it understood that, in exchange for defendant's cooperating, she would be allowed to plead guilty in the Virginia court (rather than a United States court) without a recommendation from the Commonwealth are not covered by the descriptions of plea agreements in that rule. Therefore, this agreement, if there was an agreement, must be reviewed as a cooperation agreement, as urged by the Commonwealth.[11]

Unlike the *Sluss* case, where the cooperation agreement was in writing, the parties in this case do not agree as to the terms of the cooperation agreement. *Sluss*, 14 Va. App. at 606, 419 S.E.2d at 266-67. Therefore, this Court is left to determine, pursuant to principles of contract law overlain with constitutional due process considerations, whether there was a cooperation agreement before it can decide whether it was breached and, if so, what

---

[11] If this Court were to agree with the Commonwealth's assertion that *Sandy* applies, it would mean that the Court accepted the proposition that *Sandy* overruled *Sluss* and *Sluss* was never mentioned by the Court in *Sandy*. Such an understanding seems inescapable since *Sluss* provided that agreed covenants in a cooperation agreement are binding unless the defendant breached the covenant, while, in *Sandy*, the Court did not hold that proposed plea agreements are binding unless the defendant breached the agreement. The *Sandy* Court held that a proposed plea agreement is *not* binding absent judicial approval or prejudice to the defendant. The rationale for the distinction between cooperation agreements and plea agreements is not addressed, but this Court observes that the plea agreements defined by Va. Sup. Ct. R. 3A:8 reach the conclusion of a case and more clearly implicate the judge's role and the defendant's ultimate treatment. Arguably, the effect of enforcing a breach of a cooperation agreement, which remedy is in the discretion of the court according to *Sluss*, is less threatening to the public interest than enforcing the breach of a plea agreement that reached the ultimate outcome of the case and justifies a standard that protects the public interest. Furthermore, cooperation agreements are, arguably, investigative tools; hence, there is less justification for involving the court in approval and enforcement of cooperation agreements.

remedy is appropriate. *Id. (citing United States v. Johnson*, 861 F.2d 510, 513 (8th Cir. 1988) for the proposition that the appropriate remedy for a breach of cooperation agreement is left to discretion of trial court).

## C. *Contractual Analysis*

The proponent of an oral contract has the burden of proving all the elements of a valid and enforceable contract. *See Richardson v. Richardson*, 10 Va. App. 391, 396, 392 S.E.2d 688, 690 (1990), *rev'd on other grounds*, 236 Va. 20, 23, 556 S.E.2d 767, 768 (2002). The essential elements of a contract are offer and acceptance, with valuable consideration. *See Montagna v. Holiday Inns, Inc.*, 221 Va. 336, 346, 269 S.E.2d 838, 844 (1980). A contract is an agreement, for consideration, between two or more parties, and such a contract arises when an offer is made and accepted. *Id.*

Under the objective theory of contract, which controls in Virginia, an offer has been made if a reasonable person in the offeree's position, in view of the offeror's acts and words and the surrounding circumstances, would believe that the offeror has invited the offeree's acceptance. *Chang v. First Colonial Savings Bank*, 242 Va. 388, 391-92, 410 S.E.2d 928, 931 (1991); *Richmond Eng. Corp. v. Loth*, 135 Va. 110, 139-153, 115 S.E. 774, 782-86 (1923); *see also* Va. Model Jury Instruction No. 45.040 (LexisNexis 2003). An acceptance is an unconditional promise to be bound by the terms of the offer. *Richmond Eng. Corp.*, 135 Va. at 151-52, 115 S.E. at 786. Such acceptance may be by conduct rather than words. *Id.* at 152, 115 S.E. at 786. The modern test for determining whether there was acceptance (reflecting the objective theory of contract) is whether it would be clear to a reasonable person in the position of the offeror that there was an acceptance. *See Green's Ex'rs v. Smith*, 146 Va. 442, 452-55, 131 S.E. 846, 848-49 (1926). The Virginia expression is consistent with the definition in the Restatement Second of Contracts, defining acceptance as a manifestation of assent to the terms of the offer made by the offeree in a manner invited or required by the offer. Restatement Second, Contracts § 50; 17A Am. Jur. 2d, *Contracts*, § 66. The consideration is that which is given in exchange for the agreement. Consideration is, in effect, the price bargained for and paid for the agreement or promise. *See Montagna*, 221 Va. at 346, 269 S.E.2d at 844, *see also* Virginia Model Jury Instruction No. 45.040 (LexisNexis 2003).

It is also clear that, in order to consummate a binding contract, there must be a meeting of the minds of the parties. *Marefield Meadows, Inc. v. Lorenz*, 245 Va. 255, 260, 427 S.E.2d 363, 365 (1993). Stated another way, until an offer is accepted, the parties have not assented, or, in the language

often used by the courts, their minds have not met. 17A Am. Jur. 2d, *Contracts*, § 66; *see Gardner v. E. I. DuPont De Nemours & Co.*, 7 Fed. Appx. 241, 245, 2001 U.S. App. LEXIS 6599, *9 (4th Cir. 2001) (unpublished disposition). However, while there must be a meeting of the minds, the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. *Id.* As noted above, contract principles apply in making the determination of whether there is a cooperation agreement. However, because there is a due process overlay to the contract analysis, courts have expressed the contractual question of whether there was a meeting of the minds in terms of whether the government made a firm promise. It is in that context that we examine this question. In order to determine whether there was a meeting of the minds, we will first consider whether there was an offer. The question is whether a reasonable person would have objectively believed an offer was made, not whether the offeror subjectively actually intended to make an offer. As then-U.S. District Judge Learned Hand once said in describing the difference between subjective intentions and objective belief in the context of objective contract theory:

> A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party, when he used the words, intended something else than the usual meaning which the law imposes upon them, he would still be held, unless there were some mutual mistake, or something else of the sort. . . .
> Yet the question always remains for the court to interpret the reasonable meaning to the acts of the parties, by word or deed, and no characterization of its effects by either party thereafter, however truthful, is material.

*Hotchkiss v. National City Bank of New York*, 200 F. 287, 293-94 (S.D. N.Y. 1911).

The defendant contends that she understood the offer differently than did the Commonwealth. While the parties clearly had differing understandings of the agreement, the question is whether a reasonable person would have objectively believed a firm offer was made during the discussions prior to the preliminary hearing in the General District Court, as defendant contends. The evidence here shows stark disagreement as to what was said and done in this

case. Mr. Weaver stated that the Commonwealth and the United States, through their representative, Mr. Robbins, agreed, prior to the preliminary hearing, to prosecute the defendant in the Virginia Circuit Court. Mr. Robbins, on the other hand, states that he may have said, during that initial discussion, that he would *try* to keep the case in the Virginia court, but he denies having made such a promise. Furthermore, Mr. Robbins claims that no agreement was actually reached until a later telephone conversation. Mr. Weaver recalls no discussion about the defendant pleading guilty in state court during that telephone conversation. As reviewed above at length, both the defense and the Commonwealth are able to point to conduct that bolsters their respective views as to the substance and nature of the agreement.

The Court will also address implied-in-fact contracts because there has been some suggestion by the defendant that the course of conduct confirmed, or liberally construed, supplied the terms of the cooperation agreement. It has been said that an implied-in-fact contract is an agreement "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Bailey v. United States*, 54 Fed. Cl. 459, 485 (Fed. Clms. 2002), *aff'd by Bailey v. United States*, 2004 U.S. App. LEXIS 3831 (Fed. Cir., Feb. 27, 2004). The elements of an implied-in-fact contract are mutuality of contract; consideration; lack of ambiguity in offer and acceptance; and authority to bind the government. *Id.* An agreement will not be implied unless the meeting of the minds was indicated by some intelligible conduct, act, or sign. *Bailey*, 54 Fed. Cl. at 485, 493-94. There must be a meeting of the minds on each critical term of the agreement. *Id.* at 486-87.

As noted above, the proponent of an oral contract has the burden of proving all the elements of a valid and enforceable contract. *See Richardson v. Richardson*, 10 Va. App. 391, 396, 392 S.E.2d 688, 690 (1990), *rev'd on other grounds*, 236 Va. 20, 23, 556 S.E.2d 767, 768 (2002). This proposition, when coupled with the court's conclusion in *LaTray*, 739 F. Supp. at 96, that the defendant bears the burden of proof by a preponderance of the evidence when affirmatively asserting the existence of a cooperation agreement, leads this Court to the conclusion that, under these facts, defendant Stewart bears the burden of proving the existence of the cooperation agreement by a preponderance of the evidence. The inference of appropriateness that attached to the Commonwealth's decision to seek a *nolle prosequi* is sufficient to shift the burden of going forward with evidence sufficient to overcome such

inference of appropriateness.[12] While the Court is well aware that the defendant did not file this motion and is not seeking specific performance of the alleged cooperation agreement, the Court has also taken great pains above to consider the unique procedural context in which we are operating, and, in view of the substantial deference owed to the Commonwealth's decision to seek *nolle prosequi*, juxtaposed against the defendant's assertion of the agreement in opposing the motion, the Court must conclude that, for the defendant to defeat such an inference of appropriateness that attached to the Commonwealth's decision, the defendant must carry the same burden as if she were seeking specific performance of the alleged cooperation agreement.

This Court, like the court in *Calimano*, is "essentially faced with two conflicting interpretations of discussions held between opposing counsel." *Calimano*, 576 F.2d at 640. And, again, like the court in *Calimano*, this Court "discredit[s] the testimony of neither attorney. . . ." *Id.* Neither of the parties has proven by a preponderance of the evidence the agreement they assert to have existed. The evidence in this case is, at best, in a state of equipoise as to whether there was ever a meeting of the minds on any cooperation agreement. *See Paulette's Dusters v. Howell*, Rec. No. 0542-97-3, 1997 Va. App. LEXIS 516, *3 (July 29, 1997) (unpublished disposition). In essence, the defendant, who bears the burden of proof by a preponderance of the evidence when affirmatively asserting the existence of a cooperation agreement in opposition to a motion for *nolle prosequi*, has failed to meet her burden of proof because the evidence is in a state of equipoise. *Id.* (where evidence is in a state of equipoise, the party with the burden of proof fails to meet its burden). With the defendant's failing to carry her burden of showing the existence of a meeting of the minds regarding a proposed cooperation agreement, the facts of

---

[12] This is not in any way to suggest that the burden of proof in the criminal case shifts to the defendant. The prosecution's burden is to prove all essential elements of the charged offense beyond a reasonable doubt, and this burden cannot be shifted to the defendant. *Walker v. Commonwealth*, 212 Va. 289, 291, 183 S.E.2d 739, 740 (1971). The burden of going forward with evidence of an affirmative defense is frequently said to rest on the defense, however. *See McGhee v. Commonwealth.*, 219 Va. 560, 561-62, 248 S.E.2d 808, 810 (1978). The defendant's efforts to prove the existence of a cooperation agreement to prevent a *nolle prosequi* are analogous to a defendant's efforts to prove an affirmative defense. The proof of the cooperation agreement is not an element the prosecution must show in order to prevail on the question of whether there is "good cause" for the *nolle prosequi*, and, therefore, the deference owed to the prosecution's decision to seek *nolle prosequi*, coupled with the burden on the defendant to prove a contract, results in a shifting to the defendant of the burden of going forward with proof of the agreement.

158

this case do not satisfy the requirement, recognized in *Johnson*, 861 F.2d at 512, that the defendant show the government made a firm promise or commitment. *Calimano*, 576 F.2d at 640 (evidence failed to show "that the Government made a firm promise or commitment to dismiss the indictment").

This Court also finds that, even if there had been agreement as to the terms asserted by the defendant or the Commonwealth, such terms simply do not contain the terms essential to such an agreement since the agreement suggested by both sides contained no discussion of "what level of cooperation would be required of [Stewart] in order for her to satisfy the purported cooperation agreement nor who would determine whether [Stewart] had fulfilled her part of the cooperation agreement." *United States v. Lua*, 990 F. Supp. 704, 711 (N.D. Iowa 1998) (finding an absence of sufficient detail to prove a meeting of the minds). Even in *Sluss*, the Court of Appeals noted that the cooperation agreement specifically provided a standard for defining cooperation and provided who could make the determination as to whether there was cooperation. *Sluss*, 14 Va. App. at 605, 419 S.E.2d at 266.[13] Absent such essential terms, there could be no meeting of the minds. *Id.*[14]

Even if the Court were to find that there was a cooperation agreement as a result of the discussions that took place immediately before the preliminary hearing on May 18, 2004, the defendant's own evidence in this case through Mr. Weaver is that she failed to comply with the cooperation requirement, prompting termination of the interview with Detective Gavin and the telephone call described above and leading the Commonwealth and the United States, through the same representative, to conclude there was an agreement to plead guilty in the Virginia court in exchange for cooperation. This purported agreement arising out of the second conversation, as described by Mr.

---

[13] In *Sluss*, 14 Va. App. at 606, 419 S.E.2d at 266, the court observed that the government may not unilaterally determine whether a defendant has breached a cooperation agreement in order to retract a cloak of immunity. This Court does not decide whether, for purposes of determining if "good cause" exists for a *nolle prosequi*, such a unilateral provision would be sufficient to create a binding cooperation agreement that would prevent a finding of "good cause."

[14] Even where parties have manifested an intention to make an agreement, if the content of their agreement is unduly uncertain and indefinite, no contract is formed. Restatement, Contracts (2d) § 32(1); 1 Corbin § 37 (1963); *see Parks v. Atlanta News Agency, Inc.*, 115 Ga. App. 842, 156 S.E.2d 137 (1967). The rule is that an offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain. John D. Calamari and Joseph M. Perillo, *Contracts*, § 2-13 (1982).

Robbins, is similarly devoid of the essential elements involving the level of cooperation required and how it would be determined that the defendant had complied. Therefore, just as with the first face-to-face conversation, there could be no meeting of the minds as a result of the second conversation, which was by telephone.[15]

Accordingly, finding that the evidence in this proceeding is in a state of equipoise and that the defendant therefore failed to meet her burden of showing a meeting of the minds on a cooperation agreement and further finding that the respective cooperation agreements asserted by each party failed to contain essential terms to a cooperation agreement, thereby preventing a meeting of the minds as to material terms, there was no cooperation agreement. Therefore, the Court cannot say that the Commonwealth's decision to seek the *nolle prosequi* demonstrates bad faith, is clearly wrong, or rises to the level of oppressive tactics. Finding that the Commonwealth's decision to seek the *nolle prosequi* is not clearly contrary to

---

[15] The defendant argued that, even if there was no cooperation agreement, she was still prejudiced because there was a breach by the Commonwealth of a cooperation covenant of the attempted cooperation agreement. The Court also finds that the evidence presented to this Court is in a state of equipoise as to the covenant breach asserted by defendant. The Court does note, however, that the discussion as to waiver of the preliminary hearing was met with an agreement to a reasonable bond. Beyond that possible individual covenant, which could have just as easily been construed as good faith gestures while moving down the path toward an agreement, this Court finds insufficient evidence of any possible cooperation covenants because the evidence is in a state of equipoise. *Sluss*, 14 Va. App. at 607, 419 S.E.2d at 267; *see also United States v. Ahmed Abdel Sattar*, 2003 U.S. Dist. LEXIS 19770, *8 (S.D. N.Y. 2003). The Commonwealth is not responsible for any non-covenant prejudice allegedly suffered by the defendant.

manifest public interest and according the Commonwealth's decision to seek *nolle prosequi* the deference described above and owed to a prosecutor's decision, the Court grants the motion for *nolle prosequi* of the indictment in this matter.

## *III. Conclusion*

Having considered the arguments of counsel and the evidence presented to the Court, the Commonwealth's motion for *nolle prosequi* is granted and the defendant is released from the custody of this indictment. The Commonwealth's brief in support of its motion is ordered filed. The parties having made extensive oral argument on the record to preserve their objections, the Court dispenses with the Rule 1:13 counsel endorsement requirement. It is so ordered.